# CHARLESTON.

## STATE v. WEISENGOFF.

Submitted November 26, 1919.  Decided December 5, 1919.

1. CRIMINAL LAW—*Burden of Proof—Change of Venue.*

> The Constitution guarantees to one accused of, and about to be tried for a crime, a change of venue upon a showing of good cause therefor, and the accused bears the burden of proving to the satisfaction of the court the existence of such good cause.  (p. 276).

2. SAME—*Question of Good Cause for Change of Venue—Discretion of Court.*

> The good cause alleged may be controverted by the State, and the question is one of fact addressed to the sound discretion of the court, and if his ruling thereon is prejudicial to the accused, it is cause for reversal.  (p. 276).

3. SAME—*Weight of Counter Affidavits on Application for Change of Venue.*

Affidavits, however numerous, merely negative in character, stating that affiants are familiar with the circumstances of the case about to be tried and know of no public prejudice or animosity against the accused that will prevent his having a fair and impartial trial in the county, but stating no facts on which such conclusions are based, do not overcome the evidence of accused, supported by only a small number of witnesses, who swear to facts which clearly show the existence of a strong and prevailing public prejudice against the accused and a general belief in his guilt. (p. 276).

4. SAME—*Evidence on Renewal of Motion for Change of Venue.*

The accused may renew his motion for a change of venue at any time before the jury is sworn, and is entitled to file additional affidavits in support thereof; he should also be allowed to cross-examine affiants for the State then present in court. Evidence on a motion for change of venue may be taken at the bar of the court as well as by affidavits. (p. 276).

5. SAME—*Diligence to Entitle Accused to Continuance.*

Where a continuance is asked on the ground of the absence of a witness for the accused, and it appears that he knew such witness was a nonresident of the State and made no effort to take his deposition, and showed no cause of surprise at his failure to attend at the trial, no cause for a continuance is shown. (p. 279).

6. SAME—*Derogatory Remark of Court Before Trial No Ground for Reversal of Conviction.*

An inadvertent remark made from the bench by the presiding judge, derogatory to the character of accused, but made a month before the case was tried and not in the presence of any of the jurors who tried the case, is not cause for reversal, if it appears from the record accused has had a fair and impartial trial. (p. 279).

7. SAME—*Appointment of Special Officer to Take Charge of Jury.*

Where the accused is charged with the murder of the sheriff, and his deputy becomes his successor in office, it is not error for a court to appoint a special officer, who, after being sworn and properly instructed, takes charge of the jury during the trial. (p. 280).

8.  ARREST—*Homicide—Right of Officer to Overcome Resistance—*
    *Degree of Homicide by One Resisting Arrest—"Murder"—*
    *"Manslaughter".*

    Resisting an arrest, which a proper officer is trying to make
    in a lawful manner, by one charged with crime and knowing
    the officer's authority, is an unlawful act, and such officer
    has the legal right to use such reasonable force as may be
    necessary to overcome the resistance, and if in resisting or
    attempting to escape the accused maliciously kills or fatally
    wounds the officer while he is acting in a lawful manner, the
    homicide amounts to murder, but if there was no intention
    to kill or do great bodily harm and the killing was purely
    accidental, the homicide amounts to manslaughter only. Malice
    is an essential element in murder of either the first or second
    degree.   (p. 281).

9.  CRIMINAL LAW—*Homicide—Application of Contributory Negli-*
    *gence—Evidence Sustaining Conviction of Murder.*

    Contributory negligence has no application in a criminal
    prosecution, and where it appears a sheriff sought to arrest
    the accused by jumping upon the running board of his automo-
    bile while it was in motion and informing him that he had
    a warrant for him, and when he failed to slacken his speed,
    by then trying to gain control of the steering wheel, where-
    upon the speed of the automobile was immediately, greatly
    increased, and continued for a distance of about eight hundred
    feet, when the automobile collided with an iron bridge, wreck-
    ing the machine and dashing the sheriff to his death against
    one of the iron columns of the bridge, the accused is guilty
    of murder if he could have stopped his machine and wilfully
    refused to do so, and intentionally collided with the bridge,
    but if the collision was accidental, the killing is manslaughter
    only, and the fact that the sheriff's efforts to obtain control
    of the steering wheel may have been a contributing cause of
    the collision, is no defense.   (p. 281).

10. HOMICIDE—*Exclusion of Evidence as to Injury to Defendant's*
    *Children.*

    The exclusion of evidence to prove that a doctor dressed the
    wounds of the children of accused, who were riding with him
    in the automobile and were injured by the collision with the
    bridge, is not error.   (p. 289).

11. SAME—*Evidence as to Cause of Death.*

    The testimony of an undertaker, who prepared the body of
    deceased for burial, describing the condition of his body,

caused by its violent contact with the bridge, is admissible to prove the cause of death.    (p. 289).

Error to Circuit Court, Mineral County.

Peter Weisengoff was convicted of murder in the second degree, and he brings error.

*Reversed and remanded.*

*Neely & Lively,* and *Taylor Morrison,* for plaintiff in error.

*E. T. England,* Attorney General, *Chas. Ritchie.* Assistant Attorney General, *E. L. Tyler* and *H. G. Fisher,* for the state.

WILLIAMS, JUDGE:

Defendant was indicted and tried for the murder of Donald P. Davis, late sheriff of Mineral county, convicted of murder in the second degree and sentenced to imprisonment in the penitentiary for ten years. He brings error, assigning numerous grounds for reversal of the judgment.

He petitioned for a change of venue, on the alleged ground that a strong feeling of prejudice existed in the minds of the citizens of Mineral county against him, both on account of the business conducted by him in Westernport, Maryland, just across the line from the Town of Piedmont, where the homicide occurred, his business being that of a saloonkeeper and he having been accused of selling intoxicating liquors in West Virginia in violation of law, and because of the great popularity of the deceased officer, claiming that it was not possible for him to obtain a fair and impartial trial in that county, and filed his own and the affidavits of four others in support thereof setting forth substantially the following facts:    That, in a general way, affiants knew the circumstances surrounding the death of the late sheriff; that they had heard the case discussed by numerous persons from different parts of the county and, basing their opinion on such comments made in their presence and on the fact that defendant had been actively engaged in the saloon business in Westernport and had been charged with numerous violations of the prohibition statute of West Virginia; that by reason of the further fact that deceased was reported to have met his death while attempting to arrest defendant in connection with some alleged violation of the liquor laws, and for other causes, there exists a prejudice against defendant in Mineral

county, on account of which affiants do not believe defendant can obtain a fair and impartial trial.

Petitioner also exhibited three newspaper articles, one published in the "Mineral Daily News" on the 28th of June and another in "The Mountain Echo" on June 30th, 1917, newspapers published in the Town of Keyser, and alleged to have wide circulation in the county, the first of which gives a detailed account of the manner in which Sheriff Davis was killed, refers to defendant as a "cowardly brute", states that "It is said that the bulk of his fortune has been made and is being made by violating the West Virginia prohibition laws, and that over 50 per cent of the violations in Tucker and Mineral counties come out of Weisengoff's saloon in Westernport," that he is doing a "large bootlegging business in West Virginia," that he utterly disregards the law and sells to boys at all times; and the latter characterizes him as "a Westernport outlaw saloonkeeper," a "crime-soaked foreigner," and says: "Those who are acquainted with the detail of the efforts of Sheriff Davis to force Weisengoff out of the West Virginia field with his unlawful confederacy for violation of the prohibition laws, and the defiant threats of the outlaw, coupled with his known hatred of the fearless officer, believe that after the sheriff stepped on the car and the brutal foreigner actually had him in his power through the speed he was able to secure by manipulating the accelerator, his purpose was to dash the machine against the great steel frame work of the bridge, kill or maim the officer and take his own chances of escape through his ability to handle the car. Results practically bear out this assumption."

Also another article appearing in the Baltimore Sun, a newspaper alleged to be generally circulated in Mineral county, under the date of Keyser, W. Va., July 26th, in which it is stated that a change of venue will probably be asked for in the Weisengoff case, that "the feeling is ugly at Keyser against Weisengoff, and it was impossible to get a local attorney to defend him."

The State answered his petition and filed the affidavits of one hundred and seventy-seven residents of the county to the effect that affiants were familiar with the sentiment existing in their respective communities relative to the homicide and knew of no bias, prejudice or personal feeling then existing among

the citizens thereof against the defendant because of the homi-
cide, and knew of no threats having been made against him, nor
of the existence of any ill will that would prevent him from
having·a fair trial; that no excitement existed in the community
and that affiants knew of no desire to convict the defendant, "con-
trary to what the facts may show in said matter."

These numerous affidavits are purely negative and merely
state the conclusions of the affiants, not facts from which the
court could draw its own conclusion, as the law in ,such case
requires. *State* v. *Sheppard,* 49 W. Va. 582-593; and *State* v.
*Douglass,* 41 W. Va. 537-539. It further appears that T. A.
Dixon, a deputy of the deceased sheriff, assisted in procuring a
number of these affidavits.

On the 30th. of July, 1917, the court overruled defendant's
motion and he excepted, and the case was then set for trial on the
27th day of the following August. On the day set for trial, de-
fendant renewed his motion for a change of venue, and in sup-
port thereof filed his supplemental affidavit and the affidavit of
Taylor Morrison, of counsel for defendant, who had resided in
Keyser for nine years next prior to that time, and asked permis-
sion to examine, at the bar of the court, thirty-nine of the af-
fiants for the State, who were then present in the court room.
Counsel stated that, if said witnesses were permitted to testify,
they would say, "That they knew of no facts upon which they
based the affidavits which they formerly made herein, and that a
large number of said witnesses would say under oath, that in
their opinion, there is now such deep seated and abiding preju-
dice in said county against the defendant that he cannot obtain
a fair trial herein." The court ruled that he would not hear two
motions for a change of venue at the same term, unless it could
be shown that there had been a change of sentiment among the
people of the county against the prisoner since the last motion
was decided, and said he "would not accept the statements ·of
counsel as to what the said witnesses would testify to," and that
if such evidence was proper to be considered it could be done
only ·on affidavits, and again overruled defendant's motion, to
which he again excepted.

It appears from Morrison's affidavit that the deceased sheriff
had been a resident of Keyser, the county seat of Mineral county,

that he left a young widow, a little child, a widowed mother and two brothers, all of whom lived in Keyser and were prominent socially and in business, and had a large circle of friends and relations; that deceased was deputy sheriff under his father in Mineral county, from 1908 to 1912, and was elected sheriff himself in 1916; that public opinion and feeling ran so high against accused, on account of the killing of the sheriff, that, according to his information and belief, threats to lynch him were made, and, to protect him from violence, a guard was placed at the jail; "that there exists in said county today, and especially in Piedmont and Keyser, a deep and abiding animosity against the defendant and the community generally regards him guilty and demands his punishment;" that a number of those who made affidavits stated at the time that "people generally thought the defendant guilty;" that many prominent people, who knew defendant, refused to make affidavit to the fact for the reason, "as they claimed," it would result in their "personal loss; that W. I. Knott, a prominent merchant of Keyser at whose house M. M. Neely, of counsel for defendant, had secured lodging, on hearing that he was so employed, ordered him, about ten o'clock at night, to vacate the room and refused to allow him to remain, so that he was obliged to find other sleeping accommodations for the night; that if the prisoner is forced to go to trial in the county "he will face a hostile audience and public opinion and feeling against the defendant will manifest itself to the jury in such a way that the jury, however honest it may be, will be affected thereby to the prejudice of the prisoner."

On the first consideration of this case, and in our former opinion, we were inclined to view the rulings of the learned trial court as not being prejudicial to the accused, that he had been tried by a jury composed of men who had qualified on their *voir dire* as fair minded, unprejudiced and impartial, and that the prisoner had no cause to complain of the court's denial of a change of venue. But on a rehearing and further consideration of the case we are constrained to alter our opinion on this point, as well as on the vital point affecting the crime of which the prisoner was found guilty. That a prevailing public prejudice existed against the accused, is fully sustained by the affidavits filed on behalf of defendant. That one accused of crime and

about to be tried may be able to secure a jury, who are themselves fair minded and unprejudiced against him, is not a conclusive test of his right to a change of venue. *State* v. *Flaherty,* 42 W. Va. 240. Prevailing public sentiment appears to be so strongly against accused that prominent business men of the community, realizing that fact, declined to make affidavit thereto for fear their business would suffer if they did so. While their reason for refusing to make affidavit to the fact shows moral cowardice, nevertheless it furnishes about as strong evidence of the intensity and prevalence of adverse public sentiment as the accused could obtain; it is an admission by every person who was applied to and declined to make affidavit in support of defendant's motion for the reason stated, that public feeling was so strong against him that few people dared to stem its tide, and that itself furnishes the explanation of why he was able to procure so few affidavits in support of, and, on the other hand, the State so many against his motion. We know that influences, even though silent, may so permeate a community as to make their impressions upon the jury, and thus endanger the chances of a fair and impartial trial. Few juries can be found who are willing to defy public sentiment by rendering an unpopular verdict, especially in a doubtful case, and a fair trial entitles the accused to the benefit of all doubt. Notwithstanding the burden was on defendant to show to the satisfaction of the court good cause for a change of venue, *State* v. *Greer,* 22 W. Va. 800, and was required to do so by evidence of facts, and not by the mere opinions of witnesses unsupported by facts, still defendant has fully met and discharged these requirements. He has proved such a state of facts, circumstances and conditions as entitled him to have his case removed to another county for trial.

The court should have permitted defendant's counsel to cross-examine the affiants for the State when he proposed to do so, on the renewal of defendant's motion. Affiants were then in court, and it would have required only a short time to hear their testimony. Defendant had a right to cross-examine them and the request should not have been denied. Their affidavits amounted to mere statements of conclusions, and it appears that defendant wanted to show by them that there was then such deep

seated prejudice against him he could not get a fair trial. He had a right to show this at any time before the jury were sworn, and we know of no rule of practice forbidding oral testimony to be heard at the bar of the court in support of such motion, although the usual method is to present the evidence in the form of affidavits. In view of all the facts and circumstances proven, defendant showed such good cause as entitled him to a change of venue, and the denial thereof was prejudicial, it denied him a constitutional right. Sec. 14, Art. III of the State Constitution.

Defendant moved for a continuance on the ground of the absence of Russell Sangid. He swears he was an important witness to facts which could not be proven by any other witness at the trial, that he caused a summons to be issued for said witness seven days prior to the day of trial and placed it in the hands of the sheriff and that the sheriff had not served it because the witness was out of the state, having gone to New York City on the 13th of August, 1917. It appears by the affidavit of Ed Habeeb that said witness was not then and never had been a resident of West Virginia, that at the time of the homicide he conducted a restaurant in Westernport, Maryland, and resided there, all of which was well known to the defendant. Four weeks before when the case was set for trial, the parties were notified by the court to be ready for trial on the 27th of August, 1917. Defendant knew he had the right to take the depositions of nonresident witnesses, yet no effort was made to take Sangid's deposition, and summons was not issued for him until seven days before trial day. Defendant swears he "fully expected" to have said witness present in court in his behalf on the day of trial, and that neither he nor his counsel knew he had gone to New York until the 23rd of August, only four days before. Sufficient diligence is not shown to entitle defendant to a continuance. He does not say the witness had promised him to attend trial, and, knowing he was a nonresident, he made no effort to take his deposition.

A certain remark made from the bench by the presiding judge, derogatory to the prisoner is complained of. In commenting upon the incendiary newspaper article, it appears the judge said: "The man who wrote this article suggesting lynching and mob

violence is not a law abiding citizen; he is just as bad as the prisoner at the bar." It is insisted that the judge thereby unconsciously prejudged affiant's case. On the other hand, it is argued in brief of counsel for the State, that defendant's counsel has given the remark an improper construction. It is a matter of common knowledge that no record brought to this court contains every word that passes between the presiding judge and counsel during the progress of a trial, or in the preliminary stages of the procedure, and this record does not purport to give all that transpired in the courtroom during the argument of the motion for change of venue and the consideration of defendant's petition and affidavits, that might have provoked the judge to make the remark. This court is familiar enough with the character and judicial temperament of the distinguished presiding judge to be satisfied that he would not prejudge a case, nor pronounce a judgment therein, which he did not honestly believe was justified both by the law and the evidence. We must be guided by the judgment and rulings of the court appearing by its orders and bills of exceptions, in determining whether the accused has been given a fair and impartial trial, and not by any mere inadvertent remark the trial judge may have made, not in the presence of the jury who are the sole triers of the facts. The remark could not have prejudiced any of the jurors who tried the case, for none of them were then present. The case was not tried until about a month thereafter.

It is assigned as error that the jury were not put in charge of the proper officer. Upon the death of Donald P. Davis, T. A. Dixon, his deputy, was appointed to succeed him and, because of his official connection with the deceased, when the jury were impaneled and sworn to try the case they were placed in charge of W. R. Taylor, a police officer specially appointed by the court. He was sworn to keep the jury together and not allow them to separate, and not to converse with them himself touching the matters of the trial nor allow any other person to converse with them on any subject, without the leave of the court. No objection was made to Taylor's appointment at the time, nor is it intimated that there was any improper conduct on the part of the jury. We need not say whether or not the sheriff could have discharged the duty, because it is not material. The court, no

doubt, desired to remove any ground of suspicion or cause for possible complaint that the accused did not receive a fair trial, conducted by impartial officers. Section 2, Chapter 41, Barnes' Code, empowers the court to appoint some person, other than the sheriff to execute its orders if, for any cause, it is improper for the sheriff to do so. It is clear the prisoner was not prejudiced by this action of the court, it is not pretended that the special officer was guilty of any improper conduct. Although not necessary to administer the oath to the special officer more than once, he was sworn each day during the progress of the trial, and it is not intimated that he failed to comply with the court's order.

The homicide occurred under the following circumstances: Defendant had been indicted in the circuit court of Mineral county for unlawfully selling spirituous liquors, and had given bond for his appearance at the April, 1917, term of the court to answer said indictment. The bond was declared forfeited, and a capias issued for defendant's arrest, and placed in the hands of the sheriff on the 22nd day of May, 1917. On the 27th day of June following, Donald P. Davis, the sheriff, was in the town of Piedmont and saw defendant pass through the town in his automobile, coming from Westernport where he lived. On inquiry he ascertained that the defendant would likely return over the same road, as it was the only practicable way of travel by automobile, and waited his return. Standing on the sidewalk he saw defendant returning, stepped out into the street and waved to him to stop, and defendant apparently made no effort to stop his machine, which was moving at the rate of twelve miles per hour according to his own testimony, the sheriff stepped aside and, as the machine passed him, mounted the running board and, according to the testimony of some of the witnesses, told defendant he was under arrest, took hold of the steering wheel and was apparently endeavoring to stop the machine, when immediately its speed was increased to a very rapid rate, and it ran a distance of about eight hundred feet and collided with the iron bridge spanning the Potomac River between the towns of Piedmont, West Virginia, and Westernport, Maryland, wrecking the automobile and injuring the sheriff so badly that he died in about two hours. Some witnesses say the automobile was run-

ning from thirty to forty miles an hour at the time. Defendant denies that the sheriff told him he was under arrest or that any words passed between them while the sheriff was on the running board, and swears that the sheriff himself, in his efforts to control the steering wheel, accelerated the speed, and that he himself was simply endeavoring to keep his machine in the road to prevent it from running against the curb and injuring his children who were riding with him. Some of the State's witnesses say defendant was pushing against the sheriff's body with his left arm, while still holding on to the steering wheel, as if trying to shove deceased off the running board. Immediately after the automobile was wrecked defendant crossed the bridge into the State of Maryland. He was there arrested by Maryland officers, placed in jail in Cumberland, and later brought to Keyser and indicted for murder. Two or three days before the homicide the sheriff had gone to Westernport and talked with defendant and tried to induce him to come over into West Virginia in response to the capias, and also had a telephone conversation with him on the same subject a day or two before he was killed. One witness for the State, Mr. H. R. Stotler, a deputy prohibition officer for the State of West Virginia, who seems to have been interested in having defendant tried on the indictment charging unlawful sale of liquor, testifies that, in a conversation with defendant shortly before the homicide, he told defendant they meant to break up the unlawful sale of liquor in West Virginia, and "would try to get them all," and that the defendant's reply was: "He would get us." In another conversation on the morning following the telephone conversation between the sheriff and defendant, this witness says he endeavored to persuade defendant "to be fair with Davis," (meaning, we suppose, he should come to West Virginia in obedience to the capias, as there is evidence tending to prove defendant had previously promised to do so), and that defendant replied: "Hell with Davis and Keyser." This evidence was intended to show express malice toward deceased, and on the strength of it certain instructions on behalf of the State were predicated, of which defendant complains. Defendant denies positively that he increased the speed of his machine, and swears he was excited when the sheriff jumped upon the running board,

that no words passed between them and that he did not know what the sheriff meant by it. But he admits he knew he was the sheriff, and one or two witnesses swear they heard the sheriff tell defendant he was under arrest, or that he had a warrant for him.

The case was tried upon the theory that, if defendant was resisting the sheriff's lawful attempt to arrest him, the resistance was unlawful and, if the officer's death resulted directly from such unlawful resistance, the homicide amounted to murder in the second degree, whether malice existed in the heart of accused or not. But malice is an essential element of murder either in the first or second degree, 2 Bishop's New Crim. Law, Secs. 627 and 677, and 13 R. C. L. 761, and is the distinguishing element between murder and the other grades of homicide. Authorities cited, and *State* v. *Michael,* 74 W. Va. 613; *McWhirt's Case,* 3 Gratt. 594; and 13 R. C. L. 783; Bishop, Vol. 2, Sec. 689, says: "If an act is unlawful or is such as duty does not demand, and of a tendency directly dangerous to life, the destruction of life by it, however unintended, will be murder. But if the act, though dangerous, is not directly so, yet sufficiently to come under the condemnation of the law, and death unintended results from it, the homicide is manslaughter; or if it is of a nature to be lawful properly performed, and it is performed improperly, and death comes from it unexpectedly, this also is manslaughter." However malice need not be expressed, but may be inferred from the circumstances of the killing, for example, as by the use of a deadly weapon without any, or upon slight provocation; nor need it have existed in the mind of the slayer for any length of time; it is enough if it springs into existence the instant of the killing. *State* v. *Panetta,* decided at the present term, and 2 Bishop's New Crim. Law, Sec. 677.

Manslaughter is generally described by the text-writers as any form of unlawful killing not amounting to murder; that is, a killing without malice, 2 Bishop, Sec. 627; 13 R. C. L. 673, and may be either voluntary, as where the killing, although intentional, is done in the heat of passion, suddenly produced by strong provocation, and before the passion has had time to subside; or involuntary, as where a homicide is caused by the doing

of an unlawful act "not amounting to a felony nor likely to endanger life, and without an intention to kill; or where one kills another by doing a lawful act in an unlawful manner." 13 R. C. L. 784. The absence of intention to kill or to commit any unlawful act which might reasonably produce death or great bodily harm is the distinguishing feature between voluntary and involuntary homicide. Resistance of the sheriff's lawful arrest was unlawful, and when he mounted the running board and told defendant he was under arrest, or that he had a warrant for him, his duty was to stop his automobile and submit to the arrest, for he admits he knew Davis was the sheriff, and when he refused to submit, it was the officer's right to continue his efforts, using such reasonable force as was necessary to subdue and overcome the prisoner's efforts to escape. In executing a warrant of arrest the officer must of necessity be the aggressor. "His mission is not accomplished when he wards off the assault; he must press forward and accomplish his object; he is not bound to put off the arrest until a more favorable time." 13 R. C. L. 870. If defendant had demanded the officer's authority, it would have been the latter's duty to show him his warrant, as the arrest was only for a misdemeanor, but the officer's right to arrest him was not challenged. The undisputed facts and circumstances of the case, coupled with defendant's admission that he knew deceased was the sheriff, show he was not speaking truthfully when he swore he did not know what the sheriff wanted when he stepped upon the running board of his automobile. It is no defense that deceased's efforts in trying to get control of the steering wheel may have contributed to the cause of his death. Contributory negligence has no application to a criminal prosecution for homicide. Defendant was acting unlawfully, whereas deceased was acting lawfully and was killed, not in trying to mount the running board, but after he had safely gotten upon it, by defendant's refusing to stop and by his reckless driving, and the fact that the deceased's efforts may have contributed to cause the machine to collide with the bridge, is no defense. 21 Cyc. 697, and numerous cases cited in the notes. *Belk* v. *People,* 125 Ill. 584. But the rapid driving over the street was not an act so inherently dangerous as to be likely to cause the death or great injury of the officer, and although it was unlawful for defendant not to

submit to arrest, yet his rapid driving appears to have been for the purpose of effecting his escape by carrying the sheriff, if he remained on the running board of his machine, across the bridge into the State of Maryland and beyond his jurisdiction.   This does not of itself prove malice, hence, unless the jury were warranted in believing that defendant intentionally collided with the bridge, they were not justified in finding him guilty of murder. Although defendant's general purpose was to avoid arrest, and his driving was intentional as the means of accomplishing it, yet if the jury believed the collision with the bridge was accidental, they were bound by the law to acquit the prisoner of the charge of murder.   In *The Queen* v. *Porter,* 12 Cox's Crim. Law Cases, 444, it appears the accused, in resisting a lawful arrest kicked the man in the abdomen, who was lawfully assisting in the arrest and stood on the same footing as the officer, from the effects of which he died, and the question presented was whether he was guilty of murder or manslaughter.   The jury were instructed that if the prisoner kicked the man intending to inflict grievous harm, and death ensued from it, he was guilty of murder, or if he inflicted the kick in resistance of lawful arrest, even though he did not intend to inflict grievous injury, he was equally guilty of murder; but, if within the course of the struggle he kicked him unintentionally, then he was only guilty of manslaughter.   So that the case turned upon the question, held to be properly submitted to the jury, whether the kick was made in resisting a lawful arrest, or purposely to inflict grievous injury.   There the evidence appears to have been conflicting as to whether the kick was intentionally administered, or was accidental in the course of a scuffle to avoid being humiliated by being handcuffed after the prisoner was put under arrest.   The prisoner was there found to be guilty of manslaughter only.

We have examined a great many cases of homicide of officers, committed while making lawful arrests, but have been unable to find any case holding that, where the death resulted from the prisoner's efforts to escape, and not in the doing of some particular act inherently dangerous, or designedly committed for the purpose of inflicting bodily injury, the accused is guilty of murder.   Unless the jury believed defendant intentionally collided

with the bridge, malice, an essential element of murder, is wanting, it can not be inferred from the mere effort to escape arrest.

Many instructions were given on behalf of the State, to the effect that, if the jury believed deceased was killed as a direct result of defendant's efforts to escape arrest, knowing that deceased was an officer and duly authorized to arrest him, it was immaterial to constitute second degree murder, whether he willfully intended to commit the homicide or do deceased any violent injury. In view of the circumstances attending the homicide, such instructions were misleading and prejudicial. The prisoner had three or four of his children in his automobile at the time, and it is hard to conceive that he was so indifferent to their and his own safety as to run his machine against the iron bridge intentionally for the purpose of killing or doing great injury to the sheriff. That the killing was the direct result of defendant's efforts to escape can not be doubted, but that does not necessarily show malice. The specific act committed during his continuous effort to escape, which caused the death, must have been intentionally done in order to constitute malicious homicide or murder. That defendant may have had control of his automobile and could have stopped it, and refused to do so, does not necessarily prove a purpose to kill the sheriff or cause him great bodily harm, it rather proves, we think, a deliberate purpose to escape out of the officer's jurisdiction, even though it was necessary to carry the officer on the running board of his automobile to do so.

We have sufficiently indicated in this opinion the principle by which the jury must determine from the disputed facts, the degree of homicide of which defendant is guilty, and it is unnecessary to review seriatim and at length the instructions given and those refused, of which defendant complains. That defendant is guilty of some degree of homicide must be admitted, but that he is guilty of murder in either degree, his counsel most strenuously deny. The degree of the crime depends solely on whether he intentionally ran his automobile against the bridge, or whether the collision was a mischance or accident. If he did it intentionally, he is guilty of murder, because, going at the speed which the evidence shows he was running, it was an act which would be apt to produce death or great bodily harm, and

would show malice.   The jury evidently did not believe the collision was an intentional act, else they would have found him guilty of murder in the first degree under the State's instruction No. 1, which was given.   This instruction, however, is erroneous because it told the jury it was immaterial whether the killing was intentional or accidental, if they believed the homicide resulted from the reckless driving by the defendant through the streets of Piedmont, in violation of a town ordinance. . . .

The State's instructions Nos. 2 and 8 are correct in theory, as there is some evidence of previous threats by defendant against deceased to support them.   These instructions also told the jury they could find the defendant guilty of murder in the first degree, if they found him "guilty of wilful, deliberate and premeditated killing," and further believed that defendant had proved no extenuating circumstances or none appeared from the case made out by the State.

Nos. 3, 19, 20, and 21 are erroneous for the reason that they fail to submit to the jury the question of the collision with the bridge being accidental, which if true would acquit the accused of the charge of murder in either degree.

No. 4 correctly instructs the jury concerning the right and duty of an officer in making a lawful arrest.

Nos. 5, 6, 7, 9, 10, 11, and 12 propound correct propositions of law.

Substituting the word "either" for "neither" appearing in instruction No. 13, which appears to be a typographical error, it states the law correctly respecting voluntary manslaughter.

We find no fault with Nos. 14, 15, 16, and 17.

No. 18 is as follows:  ·"The court instructs the jury that proof beyond a reasonable doubt means proof to a moral certainty, but not necessarily to a reasonable certainty; that they shall believe as jurors what they believe as men."   This instruction is bad for two reasons, first, because it suggests that the jurors may disregard their oaths by telling them what they do not doubt as men they should not doubt as jurors.   *State* v. *McCausland,* 82 W. Va. 525; *State* v. *Worley,* 82 W. Va. 350, 96 S. E. 56; and *State* v. *Young,* 82 W. Va. 714, 97 S. E. 134   A man of sufficient intelligence to serve as a juror knows what is meant by a "reasonable doubt," and whether or not he entertains such a

doubt concerning the existence or non-existence of a particular fact. And, second, the definition attempted is radically wrong in substance, because it differentiates between "moral certainty" and "reasonable certainty", when in fact the terms mean the same thing. The word "absolute" is the word supposed to have been here intended, instead of the word "reasonable," still we have to be governed by the record, and an examination of the transcript discloses that no typographical error was made in the printed record.

The court gave defendant's instructions Nos. 1, 2, 3, 5, 6, 7, and 8, and also a part of his instruction No. 4; but refused to give his Nos. 9, 10, 11, 12, 13, 14, 15, 16, and a part of his No. 4, of which he complains. The refusal to give the last part of his No. 4 was proper. It does not follow, because he may not have intended to injure or kill the sheriff that he is not guilty under the indictment. His escaping while under arrest was unlawful and makes him at least guilty of involuntary manslaughter.

The court committed no error in refusing defendant's instructions Nos. 9, 10, 11, 12, 13, 14, and 15, for reasons already given in the opinion. The specific question on which the degree of the homicide depends, and the one to which the jury's attention should have been directed, was whether the defendant ran his automobile against the bridge intentionally, or accidentally. If the collision with the bridge was intentional, while going at a dangerous speed, he was guilty of murder; and if accidental, he was guilty of manslaughter only.

Defendant's instruction No. 16 is as follows: "The Court further instructs the jury that accidental killing is not such a matter of defense as throws upon the prisoner the burden to prove it by a preponderance of the evidence; that it is the duty of the State to allege and prove that the defendant killed Donald P. Davis intentionally or wilfully, or unlawfully, and if the evidence in this case, taken all together, raises in the minds of the jury a reasonable doubt as to whether the defendant killed Davis intentionally or accidentally, they should not find the prisoner guilty of a higher offense than that of involuntary manslaughter." This instruction is correct.

It was not error to exclude the testimony of Dr. T. L. Wil-

son, concerning the treatment of wounds of two of the defendant's children immediately after the collision, caused thereby. This evidence was offered for the purpose of showing that defendant could not have intended to collide with the bridge, because of the risk of killing his own children. The fact appeared, and was undisputed, that his children were in the machine at the time, that they were hurt could not affect the question of defendant's guilt or innocence.

Nor was it error to admit the testimony of Martin, the undertaker, who prepared the body of deceased for burial, to the effect that deceased's hip was knocked out of place, the cavity filled with pus and blood and the hip crushed and bruised. This evidence was proper for the purpose of proving that the collision of deceased's body with the bridge had caused an internal hemorrhage soon resulting in death.

The judgment will be reversed and the cause remanded for a new trial.

*Reversed and remanded.*