# CHARLESTON.

## STATE v. FRED BEST.

Submitted September 19, 1922.    Decided September 26, 1922.

1. CRIMINAL LAW—*Opinion by Intermeddler That One About to be Arrested by a Police Officer Had Violated no Law Inadmissible.*

   The opinion of an intermeddler that one about to be arrested by a police officer has violated no law justifying his or her arrest, is not proper evidence on the trial of such police officer on an indictment charging him with the unlawful and malicious shooting of such intermeddler. (p. 568).

2. SAME—*Evidence Concerning Appearance of Defendant's Face, in Prosecution for Malicious Shooting, Irrelevant.*

   Nor did the appearance of the police officer's face, when following such intermeddler and a prostitute on the street for the purpose of seeing that she keeps her promise to retire to a hotel until the arrival of the train on which she has promised to leave for her place of residence, under the circumstances of this case, have any relative bearing on the issues involved in his trial for the alleged unlawful and malicious shooting of such intermeddler. (p. 568).

3. ASSAULT AND BATTERY—*Evidence in Prosecution of Police Officer for Malicious Shooting, Throwing Light on Conduct of Intermeddler Shot by the Officer Admissible.*

   Evidence of witnesses present immediately before the arrest of such prostitute and at the time of her arrest, and others as to her conduct and known character, and as to her defender's knowledge thereof, calculated to throw light upon and characterize the subsequent conduct of him and the officer before and at the time of the difficulty and the interchange of shots between them, was proper evidence to go to the jury, and should not have been excluded on the trial of the officer for the alleged unlawful and malicious shooting of his antagonist. (p. 570).

4. SAME—*Ordinance Justifying Arrest by Police Officer Admissible in Prosecution of Officer for Malicious Shooting.*

   The municipal police ordinance of the city of Morgantown, of which the accused was an officer, relating to loitering, and to which he referred his authority in arresting the prostitute, was competent and legal evidence to go to the jury on his trial, at least on the question of his good faith in

making the arrest and defending himself against the intrusion of White, and the ordinance should have been admitted. (p. 571).

5. CRIMINAL LAW—*Abstract Instruction on Malice in Prosecution for Malicious Shooting Held Error.*

The facts and circumstances given in evidence in this case did not warrant an instruction in the abstract, telling the jury that to convict one of malicious shooting it was not necessary that malice should exist in the heart of the accused against another, but that such malice might be inferred from the act of shooting with a deadly weapon. In a case like this the jury are bound to take into consideration all the facts and circumstances disclosed by the evidence, and it was misleading to tell the jury, as State's instruction number three in this case did, that malice might be so inferred, without reference to the facts and circumstances calculated to rebut such inference of malice. (p. 571).

6. ASSAULT AND BATTERY—*Instruction Charging That Accused Might Inflict Injury with Any Deadly Weapon Held Error, in Prosecution for Malicious Shooting.*

State's instructions numbers three and four were prejudicial to the defendant's rights because they indicated to the jury that they might find the defendant guilty if he inflicted the injury upon the prosecuting witness by striking him or shooting him with *any* deadly weapon, for the indictment limited such striking and shooting to a gun with bullets and did not authorize conviction for an offense inflicted in any other way. Instruction number four told the jury in so many words that they might convict if defendant assaulted White "with any deadly weapon." The qualifying words "in manner and form charged in the indictment," did not cure the defect in that instruction. (p. 572).

7. ARREST—OBSTRUCTING JUSTICE—*One Having no Blood Relationship With One About to be Arrested Cannot Lawfully Interfere; One Unlawfully Interfering with Arrest Guilty of Breach of Peace, Justifying Own Arrest Without Warrant.*

One having no blood relationship or the relationship of master and servant to one about to be arrested by a municipal police officer for a supposed offense, whether with or without a lawful warrant, has no lawful right to interfere to resist such arrest when the one about to be arrested offers no resistance thereto. And if one not so related interposes and commits an assault upon the officer, he is guilty of a breach of the peace justifying his own arrest without a warrant. (p. 574).

8.  SAME—*One Not Justified in Interfering with Officer Making Arrest Peaceably, with or without Legal Process.*

    While in some cases third persons may lawfully intervene to prevent a fight or other breach of the peace accompanied by violence, one is not justified in opposing an officer of the law who is attempting to discharge his duties peaceably, with or without legal process. (p. 376).

9.  CRIMINAL LAW—*Instruction Ignoring Essential Element Should be Rejected.*

    A binding instruction to the jury which ignores essential elements to be considered by them, though correct in the abstract, should be rejected as inapplicable to the facts on which the rights of the parties depend. (p. 577).

Error to Circuit Court, Monongalia County.

Fred Best was convicted of assault and battery, and he brings error.

*Reversed and remanded.*

*Frank P. Weaver, Albert Shuman,* and *Terence D. Stewart,* for plaintiff in error.

*E. T. England,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

MILLER, JUDGE:

This writ of error is prosecuted by defendant to reverse the judgment of fine and imprisonment pronounced against him by the Circuit Court of Monongalia County on October 21, 1921.

The indictment on which he was tried and convicted charged that ''Fred Best on the —— day of August, 1921, within one year next preceding the date the finding of this indictment, in the county aforesaid, with a certain gun then and there loaded with gunpowder and bullets, unlawfully, feloniously and maliciously did shoot one Glenni White, with intent him the said Glenni White then and there to maim, disfigure, disable and kill against the peace and dignity of the state.''

The verdict of the jury upon which the judgment complained of was pronounced, was as follows: ''We, the jury, find the defendant not guilty of unlawful, felonious or

malicious shooting with intent as charged in the within indictment, but do find him guilty of assault and battery.''

Defendant was a police officer of the city of Morgantown; and Glenni White, upon whom the indictment alleges the offense was committed, was a constable of Monongalia County. The difficulty out of which the alleged offense arose began when the defendant in the discharge of his duties as a police officer, and on complaint of a railroad employee at the station, where the difficulty began, went to the station in answer to a telephone call concerning a girl or woman of reputed bad character said to have been loitering in the neighborhood of the railway station. The account of this difficulty, as told in the language of the defendant, is as follows:

''Q. What was that call? A. A call came from the B. & O. station and stated that there was a bad character—woman—down there, and men and boys hanging around, and she ought to be looked after. Q. What kind of a call was it? A. Telephone call. Q. Go ahead and tell the jury what you did in respect to that call. A. I went down there, and, of course, it is always custom to go to the party who calls, to find out what the exact trouble is. I thought it was my duty to go and see the agent first. I went to the ticket window—operators window, rather—and asked him if he had sent a call into the police station. He says, 'I did not.' I then told him I had a call from the B. & O. station to come down there; that there was a bad character woman there conducting herself in a bad way and should be looked after, and men and boys hanging around. He pointed over my shoulder then and said, 'There is the girl, I suppose, you are looking for.' I turned and there was a girl standing there with Glenn White, 'Cocky' Molter, and several other young men standing around—I did not notice who they were particularly. I recognized the girl as a character pointed out to me before here in town, and I walked up to her and asked her what she was doing, and she said she had a job here in a grocery store on Pleasant Street, and I asked her to come and go with me and I would

find out whether she had a job there or not. Then she changed her mind about that and told me if I would let her go she would go on the first train to Fairmont. I· told her that would be all right; if she would do that I would let her go. Then I asked her when·she came to town, and· she says, 'Yesterday.' I also asked her where she stayed last night, and she says, 'The Maderia Hotel.' 1 says, 'You go there then and stay until this next train comes,' and she says, 'All right, I will.' Then she says to Mr. White, 'Go with me.'—I am just a little ahead of my story.—When she spoke of the position on Pleasant Street, she said Mr. White got her the job. I told Mr. White he had better not go with her, that she knew the way up there and it wasn't necessary, but he insisted upon going, and I says, 'All right, I will go. along to see if she goes up there or not.' I followed along the street behind them—I suppose I was twenty feet behind them, and when I saw they had no intention of turning up to the Maderia Hotel, I stepped up a bit faster and met them right there in front of the Bishop Garage— between the sales room and the big door‛ entrance. I walked‛ up to the girl and took hold of her arm, and I asked her, 'I thought you told me you were going to the Madeira Hotel.' Before she could make any reply, White jerked her loose from me and gave me a shove and wanted to know what business it was of mine, and told me to keep my hands off of her; that that wasn't any of my affairs. I then took White by the arm and told him I would place him under arrest for interfering with an officer. He says, 'Maybe you will.' I says, 'I have done it.' We walked along the street thirty or thirty-five feet when we reached the entrance here to the Victor Mills—at the alleyway there—I started to go diagonally across the street and up the alley, past Alex Davidson's garage, and as I started to go down to the curb with him he broke loose and says, 'God damn you, you aint going to arrest me,' and reached for his pocket as though he was going to draw a gun or something. At that time I struck him with my club, and he threw his left arm up as I hit him, and started backing away and drawing his gun.

When I seen he had a gun in his hand, I started to back away, and he started to draw another gun, in the meantime dropping the gun he drew out first. He made an attempt or two to pick that gun up, and as I was backing away I drew my gun, but he changed his mind about picking that gun up and covered me with his guns and hollowed two or three times not to pull my gun, at me. 'I have a better gun than you have.' Before I could get a chance to get my gun out, I was backing away side ways and zig zagging, trying to keep out of range of his gun. I noticed that he had gun trouble; I heard his gun snap. He takes his left hand over to his right and had it pointed at me all the time. By that time I got my gun out and ordered him to drop his gun, which he refused to do. I asked him three or four times. The last time I seen that my life was in danger; I could see he intended to kill me, and I had no other resort than shoot back, so as I shot he shot at me, as I was backing across the street,—followed me as I remember; it seems like first I shot and then he would shoot. Like one shot and then the other. I got over to the alley and turned up the alley, back of the Morgantown Laundry. There I met Deputy Sheriff McDaniels. I think that's about all I can say, unless the attorneys ask me something.

White's account of the difficulty is as follows:

"Well, I went down to the B. & O. station about the time they was gathering there for the M. & K. train in the evening, something after six o'clock. I met there a girl standing at the end of the depot. I don't know her name except that her first name was Goldie. She was standing there talking with a young man by the name of Molter—John Molter. After I came down the girl asked me in regard to assisting her about a job she had seen about in a store. I talked with them a little bit. It was raining quite hard at the time, and we stepped up to the porch of the B. & O. side, out of the rain. In a few minutes—maybe two or three—Patrolman Best came around from the other side of the depot and said, 'Where is this girl from?' She spoke up and said she was from Fairmont; and he says, 'What the

hell are you doing down here?' She said she had come to see about a job. He says, 'Job hell! You are down here chasing around on the street.' Then he asked her where she was staying. She said she wasn't staying any place for the present; when she was down here before she had a room at the Madeira Hotel, but if she got her job she was going to try to get a place somewhere else where she could get a cheaper room, and if she did not get her job she was going back to Fairmont on the next train. I think that was about the conversation between them; and then he turned in and says, 'You better get to hell up there and see about your job.' I was standing a little over to one side, and I hadn't said anything, and I said, 'Maybe you had better go up there and see about the job.' Then she asked me to go with her, and I told her I was in a hurry. Best spoke up and says, 'White, I think you've got a hell of a lot to do, running around in company with such girls.' I turned to Best then and said I didn't see that it was any of his business whose company I kept. As for the girl, I did not know anything about her, but if she could get a job and work, it was better than to chase around the streets. We turned then and came up from the depot, and Best following along behind, mumbling something. I didn't pay much attention to what he did say, and did not make any reply. As we come around the corner on Front Street, there in front of the harness shop, the last thing I heard him say was, 'I'll get that damned son of a bitch.' We was some little distance ahead, and I don't know who he was speaking to. We walked up Front Street toward the Bishop garage. The first that I knew Mr. Best run up behind and grabbed the girl by the arm and says, 'Girl, I am going to take you up and lock you up.' I turned and says, 'What are you going to lock her up for?' He says, 'None of your God damned business.' I says, 'Unless you have got a warrant for this girl, or she was doing something to violate the law, you had better go on and let her alone—she is in my charge.' Then he says, 'You damned son of a bitch, I'll take you and lock you up.' I says, 'What are you going to arrest

me for?' He says, 'I'll show you, you damned son of a bitch, consider yourself under arrest.' And he whirled me over the head with his mace twice. I threw up my arm to protect myself, and he hit me on the arm. The first time he hit me here (witness indicated to the jury where he was struck on head), and the next time a little further front. The first time he hit me, it kind of dazed me, and when he hit me the second time, it brought me to, and I throwed up my arm to protect myself. I have a black jack mace I have always carried here, (witness indicates right hip pocket), but that day I had just come in from the pay master trip— been away with the pay that day—and I had loaded up with guns to protect myself, and I had put an extra gun—a thirty-eight in this pocket (again indicating right hip pocket), and put the mace over here, (indicating left hip pocket). With natural instinct I reached for the mace, and instead of getting the mace, I got the gun. I carried another gun in the holster down here, and when I reached for the mace, I pulled this gun. It caught on the bottom of the holster and threw the gun on the pavement. That flustrated me when I pulled the gun, because I expected the mace instead of the gun. I said, 'Don't you come an inch closer.' He started backing off, and I started backing off, and we backed—I don't know—something like eighteen or twenty feet. Q. You mean you were both backing? A. Equal distance, I think. He kept threatening me if I did not put up the gun he would shoot. I stood with my gun at my side and said, 'Go away and let me alone.' And directly he just pulled up and shot twice. Q. How long from the time you pulled your gun until Mr. Best pulled his? A. Quick as he could pull it. Q. From what part of his clothing did he get that gun? A. Got the gun down here at his side somewhere. Q. How long did you stand with your guns in your hands before you shot?. A. Four or five minutes. Q. During that time were you and Mr. Best talking to each other? A. Yes. Q. If you remember, what were you saying? A. I kept telling him to go on and leave me alone, and he kept telling me that if I did not put down that gun he would shoot me. Q. Who fired

the first shot? A. He held his gun on me— Q. Who fired the first shot? A. Mr. Best. The first shot struck me right here, (indicating bowels). Q. Who fired the second shot? A. Mr. Best. Q. Did the second shot strike you? A. The second shot struck me right through the right wrist. Q. What happened from that time on? Who fired the third shot? A. Best. Q. And the fourth, if there was a fourth? A. Best. Q. And the fifth? A. I did. Q. How many shots fired altogether? A. Five. Q. Mr. White, I will get you to stand and hold your arm in the position it was when the shot struck your right wrist? A. (Witness stands). We was facing each other as you and me face each other now. Q. Is that the hand in which you held your gun? A. Yes. Q. Beginning with the firing of the second shot, continue your story. A. When the second shot struck me, or the reaction from the first, I didn't know what happened for a little bit, but when I come to, I was in front of Mr. Reed's house. Q. Where is the Reed house from the Victor Mills? A. Next house up the street. Q. Do you know whether or not that is the old Robert Vance property? A. Yes, sir. There was a shot fired from across the street towards the other side of the street, that drew my attention to what was going on. Mr. Best turned to run from where he was there toward the corner of the Price Furniture Building. He run around the corner of the building, and stood with his gun pointed back toward me. I could see his arm and gun, but could not see the rest of him. My idea was to protect myself, and that's when I saw the condition my hand was in. The blood was running down and you could see the hole in this side, and my hand was clinched. There was some one on that corner besides Best that was practically in range from where I was to where he was. I got up in some way to bring myself in range with the alley where he was, and he shot back over his shoulder at me. I was holding my gun in one hand, and holding my left hand under that hand (witness shows jury position of hands), and reached through with the front finger of the left hand, and when the fourth shot was fired,

91 W. Va.

it went close to my ear. I could hear the concussion when that whistled by my ear, and I closed the trigger with this fore finger of my left hand. He turned and ran up the alley, and I turned and saw a taxi either standing or coming, and I said, 'Come on and take me to the hospital, I am shot.' He says, 'I see you are.' I hobbled back over to where the trouble started in the first place, and picked up the other gun that had fallen out on the street, and got in the taxi. It was headed down Front Street and started up Walnut, and I told him to drive to the squire's office until I swore out a warrant. I was carrying both guns, one clinched in my hand, and the other in my lap. I laid them on the squires table, and had to pull this one (pointing to gun) out of my hand, and I managed some way to sign the complaint in that warrant. I said, 'Can't you take care of these guns? I won't have much use for them for a while.' He said 'I will lock them up in the safe.' From there I was taken to the hospital, where I was operated on, and was there until discharged from the hospital two weeks ago.''

Some other details of the transactions were brought out upon direct and cross-examination of these witnesses; but enough is disclosed by their evidence to show the pertinency of the points of error relied on for reversal, and particularly on the question or proposition of the plaintiff in error, that he was not guilty of the offense charged, nor of the offense of which he stands convicted.

The first point of error assigned, namely, the insufficiency of the indictment, on demurrer or motion to quash, was abandoned by counsel for defense in argument.

The second relates to the admission of alleged improper evidence introduced by the State, notwithstanding the objections interposed by the defendant. But two instances of this are specified by counsel; the first, that the prosecuting witness was allowed to state that to his knowledge the woman Goldie Satterfield, when defendant took her by the arm and said, ''I am going to take you up and lock you up,'' had not violated any law of the State. The only other instance pointed out and relied on, relates to the testimony of

the witness George Carroll, to the effect that at the time
White was walking up the street, the defendant following,
as related by both White and Best, Best's face looked pretty
red, not like it always had before, and not like he was in a
very good humor. It is urged as to the first, that if de-
fendant, a police officer, knew the woman had or was violat-
ing the law, that was sufficient for his purposes, and that it
was immaterial whether White was so advised or not, and
that the latter's opinion or want of knowledge thereof had no
place in the evidence. As to the second, the objection is that
the defendant's appearance as testified to, suggested by
innuendo that the shooting was the result of a dispute be-
tween the two officers of the law over the Satterfield girl.

Of course White's knowledge or opinion as to whether
there had been a violation of the law by the Satterfield
woman was immaterial and had no bearing on the issue being
tried by the jury. So far as the record shows he was an
intruder, and manifestly was intermeddling with the duties
of the police officer. We doubt, however, whether this irrele-
vant and improper evidence had any substantial influence
on the verdict of the jury now complained of. White stood
in no relationship to the woman justifying his interference
with the officer. The officer had not struck her; he was en-
gaged in no fight with her; nor so far as she was concerned
was she resisting his orders, or her arrest. She practically
admitted she had violated, or was violating, an ordinance
of the city, that she was a vagrant on the streets without em-
ployment or any place of abode; and when the officer laid
his hands upon her, she had violated her promise to go to the
hotel and wait there for the next train to Fairmont, where
she said she lived, and to which place she agreed to return.

The appearance of the officers face was unimportant. It
might well be accounted for by Whites interference and
refusal to obey the officers injunction respecting his follow-
ing a woman of the reputation of the Satterfield woman.
The evidence is that at the railroad station, where she was
when complaint was telephoned to the police station, she was
being followed by men and boys like White, with no good

purpose, in such a way at least as to offend the sensibilities of decent and respectable citizens. In such a case White should have been sustaining the police force rather than opposing the officer in the execution of the law. There was nothing in the conduct of defendant at any time justifying the insinuation, if any was intended, that he had had or was attempting to have any quarrel or disagreement with White about the woman, except in the discharge of his duties. as an officer of the law.

A third point of error relates to the rulings of the court on certain questions propounded by defendants counsel on cross-examination of the prosecuting witness White. The object of these questions was to elicit from him whether he had known the Satterfield woman before he met her at the railroad station; whether he had seen her before that time; why he was interested in getting her a job; and whether he had tried to get her a job, and if so, whether he had succeeded in doing so. In view of his conduct in interfering with the patrolman, we think these was pertinent questions, for the facts sought would have thrown light on and tended to characterize his subsequent conduct and deportment toward a fellow officer.

Another point having direct relation to the subject of the third point, is that the court below erroneously denied defendant the right to propound certain questions to sundry of his witnesses, namely, Shipp, the baggage master, who made the complaint against the Satterfield woman, Martin, Snider, Moore, P. C. White, and Vitt. The purpose of these questions was to explain when and why defendant was called to the railroad station, and what the witnesses had observed concerning the conduct of the woman, her reputation and known character at Fairmont and elsewhere, and the personal knowledge of her character and conduct by White the prosecuting witness. All evidence of this character tended to throw light on Whites conduct, as well as that of defendant, at the time the shooting occurred subsequently between them, justifying the conduct of the patrolman and condemning that of White in resisting him. *State* v. *Wald-*

*ron,* 71 W. Va. 1; *State* v. *Alderson,* 74 W. Va. 732; *State* v. *Panetta,* 85 W. Va. 212, 219; *Gibbard* v. *Evans,* 87 W. Va. 650, point 3, syllabus.

Another question presented by the same assignment of error, but which does not seem to be specifically urged by defendant's counsel in his printed brief, is the refusal of the trial court to admit in evidence a copy of the municipal ordinance of the City of Morgantown on the subject of loit-ering. It was to this ordinance especially that the defend-ant referred his authority to arrest the Satterfield woman. This evidence was certainly admissible, at least on the ques-tion of defendant's good faith in making the arrest of the offender, whether lawfully justified without a warrant or not. He manifestly thought he was justified by this law in giving direction to her in the first instance, and after-wards in arresting her, and whether so or not, it was none of White's business, as a fellow officer or as a private citi-zen, so long at least as the patrolman was not assaulting or otherwise abusing her in a manner not justified by her con-duct. This proposition will be referred to again, in con-nection with the ruling on the instructions to the jury.

Error is next assigned in reference to the giving and refusing of instructions to the jury. Of those given on be-half of the State, it is complained that numbers 2, 3, 4, 8, 9 and 10 are bad. The others, though objected to, are not here complained of.

Instruction number two told the jury that to convict one of malicious shooting it is not necessary that malice should exist in the heart of the accused against the wounded per-son; that if the accused was guilty of shooting another with a deadly weapon, the intent and malice might be inferred from the act. It is conceded on the authority of *State* v. *Welch,* 36 W. Va. 690, 697, that this instruction may be good as an abstract proposition; but it was improperly applied to the facts and circumstances of the case at bar. We think it is rightfully subject to the criticism of counsel as possibly misleading; for in a case like the one here, the jury are bound to take into consideration all the facts and circum-

stances disclosed by the evidence tending to rebut any presumptions inferable from the bare fact of the shooting with a deadly weapon. It is not unlikely that the jury in this case, considering the character of the verdict, were deceived by this instruction. Manifestly they were controlled in their verdict by the facts and circumstances of the shooting and not by inference from the bare fact of the shooting with a deadly weapon, that defendant acted maliciously. The instruction should have submitted the proposition with reference to the facts and circumstances of the shooting.

Instructions numbered three and four we think are clearly erroneous, and should not, in view of the indictment, have been given in the language propounded to the jury. The third told the jury, in substance, that if the defendant unlawfully but not maliciously struck or shot the witness Glenni White and thereby wounded him with the intent charged in the indictment, the jury should find him guilty, the degree of the offense to be determined by whether or not they should believe he had acted with or without malice aforethought, and with or without intent as charged. Number four told the jury that if they found defendant made an assault upon White *with any deadly weapon* capable of producing a dangerous wound *in manner and form* as charged in the indictment, they should find him guilty, the degree of his guilt to be found as stated in the third instruction.

The complaint of defendants counsel common to both instructions is that they would have justified a verdict of guilty of some offense whether the striking or shooting was with "a certain gun then and there loaded with gunpowder and bullets" as charged in the indictment, or with any other deadly weapon. The verdict of the jury acquitted the defendant of the offense charged in the indictment of unlawfully, feloniously and maliciously shooting White with the intent charged against him, and he can not be again tried for that offense. For the offense of which he was found guilty, he might, if the evidence justified it, have been found guilty of assault and battery if inflicted with a gun

and bullet; but as the evidence showed defendant struck
White with his mace or night stick, the jury may, according
to the instruction, have found him guilty of assault and
battery with the mace or stick; but being confined to the
charge in the indictment, this would have been erroneous,
for the defendant is not so accused. *State* v. *Gibson,* 67 W.
Va. 548, 550. The attorney general concedes the proposi-
tion just stated, but insists that the words of instruction
number four, "in manner and form as charged in the in-
dictment," limited the jury to an assault and battery with
a gun and bullet. But the instruction said, "with any
deadly weapon," when only one was charged in the indict-
ment. For this reason it tended to deceive the jury, and
may, for aught that appears have successfully done so. The
jury may have thought the shooting was justified and con-
stituted no offense, but that the previous striking of White
by defendant with his mace was not lawful or justified at
that instant.

The State's instruction number eight, next complained of,
told the jury, we think erroneously, that if they believed
from the evidence beyond a reasonable doubt that there was
a mutual combat between defendant and the witness Glenni
White, that is, a series of assaults by each against the other,
and that the defendant engaged therein freely and with con-
sent, and not alone for the purpose of protecting himself
from bodily harm or injury, then defendant was guilty of
felonious assault, or unlawful assault, as the jury should
determine from the evidence. We think this instruction is
bad, for several reasons; first, because the combat or assault,
if any, was limited by the indictment to a gun with bullets;
second, because there is no evidence of a mutual combat
between defendant and White, or of a series of assaults by
each against the other freely and with consent engaged in
by the defendant for purposes other than protecting himself
in the discharge of his official duties; third, because the
evidence shows White was from the beginning voluntarily
engaged with interfering with defendant in the discharge
of his official duties, or at least in the discharge of what he

believed to be his duties with reference to the complaint made against one concededly a common prostitute loitering on the street and pursued by White and others. White undertook to justify his conduct toward the woman by the assumption that defendant's arrest of her was without a warrant, and therefore unlawful. But suppose that it was, it was none of his business. So far as the record shows, she was not resisting her arrest. White alone undertook to do so. That the woman was guilty of an offense under the ordinance, there can be no doubt, and there can be no doubt that White was assisting her to evade the law, and the officer to whom complaint had been made. We are not called upon to say whether or not defendant was justified in arresting her without a warrant, for if without a warrant, she might, and apparently did, freely consent to her arrest, and if so, and whether so or not, White was without right to interfere. If her arrest was without warrant of authority, the woman might have resisted it, or she might have acquiesced. She made no resistance, and it was not within the right of White to volunteer assistance or interpose his resistance.

That one arrested without lawful authority or process may resist such arrest to the extent reasonably necessary to protect his rights, is settled by our case of *State* v. *Lutz,* 85 W. Va. 330, 337, and other cases. But in the case at bar, Whites interposition was, under the facts and circumstances of the case, most reprehensible and wholly unjustified, and we think the defendant was justified under the law in placing him under arrest; for manifestly his conduct, first in pushing the defendant off the sidewalk, and then in attempting to rescue the woman from his possession, constituted a breach of the peace justifying White's arrest and detention by defendant, and in protecting to the extent reasonably necessary himself and his possession of both White and the woman. *State* v. *Weisengoff,* 85 W. Va. 271, syl. 8.

While it may be true that persons standing in certain relations of consanguinity, as parent and child, husband and wife, or master and servant, and the like, may resist an offi-

cer in making an unlawful arrest, third persons, as a general rule, have no such right of interference. The right of a third person to interefere is generally limited to cases where persons are engaged in fighting and in breaches of the peace. 5 C. J. 751, § 238, and cases cited in note. In such cases, however, the right of interference in aid of another is limited to a lawful resistance by the person threatened; and the right of a person to defend another does not ordinarily exceed such persons right to defend himself, except perhaps in cases of children. 5 C. J. 751, § 239, and cases cited in note.

So that in the present case, White's conduct toward the defendant amounted to a breach of the peace justifying his arrest, and on that ground and the maintenance of his custody by defendant by every means reasonably necessary. *State* v. *Lutz, supra; State* v. *Long,* 88 W. Va. 669; *Marcuchi* v. *Railway Co.,* 81 W. Va. 549. In this case the evidence is clear that defendant used no violence upon White until the latter undertook to rescue the woman from him, and shoved him; and that he used no gun until White drew his gun in an unsuccessful effort to shoot defendant, and then only in self-defense, for the evidence shows that defendant undertook to withdraw, and was pursued by White, resulting in the defendant's shooting him to protect his own life.

The State's ninth instruction we think was good, in form at least. It told the jury that if they believed from the evidence beyond a reasonable doubt, that defendant attempted to arrest the witness Glenni White without a warrant when the said Glenni White had not committed a felony, nor a breach of the peace in the presence or view of the said defendant, then the attempted arrest of the said Glenni White was unlawful, and that he had a right to resist the same. Applied to this case, however, it is doubtful whether there is any evidence justifying the assumption that White had not at the time of his arrest committed a breach of the peace. If there is any evidence justifying it, it is the testimony of White, which is of doubtful import, for he was not clear that the patrolman used any force or

gun until after he arrested the woman and White under-
took to interfere, claiming that she was in his charge, and
thereby committed a breach of the peace by opposing· the
officer.

Instruction number ten, also complained of, told the jury,
in substance, that a police officer of the city of Morgantown
had no right under the law of this State to arrest or attempt
to arrest any person without a warrant unless such person
had committed a felony, or some offense less than a felony
in his presence or view amounting to a breach of the peace,
and that the person so unlawfully arrested or attempted to
be arrested might 'resist and repel force with force if such
person believed himself to be in imminent danger, and that
it was necessary to do so to save his own life or to save
himself from great bodily harm. It is uncertain whether
this instruction was intended to .be applied to defendant's
arrest of the woman or of White; if to the former, it was
misleading; if to White's arrest for his interference, it was
inapplicable upon grounds already considered in disposing
of defendant's exception to instruction number eight.

Respecting instruction number eleven. It advised the
jury that if they believed from the evidence beyond a reas-
onable doubt that White was assaulted by Best with his
mace, and that White believed he was about to suffer further
bodily harm at the hands of Best, and had reasonable cause
for so believing, then he was not bound .to wait until his
adversary got close enough to further strike him, but was
entitled to act on appearances and to take such steps as
should be necessary to prevent bodily harm, even to the
extent of taking Best's life. This is not the law applicable
to' this case. It ignores the fact that White was the aggres-
sor; that he was then interfering with the officer, and had
himself committed a breach of the peace justifying his own
arrest. He could have retired at any time without danger.
The danger he encountered was invited by his own conduct.

This disposes of all the instructions submitted on behalf
of the State. The defendant's counsel proposed some
twenty-nine different instructions, exhaustive almost of all

the law, abstract and otherwise, on the subject of unlawful and malicious shooting, and the law respecting arrest and resistance thereof. Of these the court gave numbers 1, 2, 3, 5, 8, 9, 11, 17, 18 and 19. We have examined the instructions given. In our opinion they substantially cover the law applicable to the case. Most of those rejected were substantially covered by those given; and the general rule, many times applied in our decisions, is that it is unnecessary for a trial court to repeat legal propositions though applicable, in instructing the jury.

Instruction number fifteen, rejected, is the only one to which our attention is especially directed. But for two defects we think it stated the law applicable to the concrete case. It undertook to define the rights of White and Best after the latter placed the former under arrest, and the right of Best to use a deadly weapon upon White to protect his own life from the violence of White. It is faulty in failing to include the element of the lawfulness of White's arrest and the element of defendant's belief and reasonable cause to believe that he was in danger of great bodily harm at the time he inflicted the wounds upon White. If these elements had been included in the instruction, we think it should have been submitted to the jury, for we do not find that the case presented by the evidence was so fully covered by any other instruction given on behalf of the State or of the defendant.

From the foregoing we conclude that the judgment below must be reversed, the verdict set aside, and a new trial awarded defendant.

While the defendant has been acquitted of the particular offense charged, he is subject to trial on any inclusive offense, upon the same evidence adduced or evidence that may be adduced on a new trial, in accordance with the practice indicated in the case of *State* v. *Prater*, 52 W. Va. 132, 164.

*Reversed and remanded.*