STATE OF WEST VIRGINIA

*v.*

ROY B. REPPERT

(No. 10081)

Submitted January 18, 1949. Decided April 5, 1949.

LOVINS, JUDGE, concurring.

FOX, JUDGE, dissenting.

*Wysong & Wysong*, for plaintiff in error.

*Ira J. Partlow*, Attorney General and *W. C. Marland*, Assistant Attorney General, for defendant in error.

HAYMOND, PRESIDENT:

The defendant, Roy B. Reppert, was indicted by a grand jury of Webster County at the January Term, 1948, of the circuit court for the murder of Ralph Ware in that county in September, 1947. On the petition of the accused the case was removed to Braxton County, where it was tried in March, 1948. The jury returned a verdict which found the defendant not guilty of murder of the first or second degree but guilty of voluntary manslaughter and the defendant, by the judgment of the circuit court of that county, entered March 22, 1948, was sentenced to confinement in the penitentiary for a term of five years. To that judgment he obtained a writ of error to this Court.

Shortly before nine o'clock at night on Saturday, September 13, 1947, the defendant, who was then Chief of

Police of the Town of Addison or Webster Springs, in Webster County, while on duty with another police officer, Charles B. Skidmore, using a station wagon in the central part of the town, received information that some drunken men were causing a disturbance in the northern end of the town located across Back Fork River, a branch of Elk River, and about one half mile from the business section. Each of these officers was wearing his uniform and was armed with a revolver at the time and, after going to a nearby restaurant to get a night stick about two feet in length which the defendant kept at that place, they proceeded in the station wagon across a road bridge over Back Fork River and up the river to a foot bridge at or near the location of the reported disturbance. Upon arriving at this point, the officers saw four or five men, all of whom ran except Ware and his companion, a man named Gregory. The officers got out of the station wagon and the defendant fired two shots from his revolver for the purpose of halting the men who were running from the policeman. These men escaped. At the time, Ware was sitting on a cross tie of the railroad nearby and Gregory was near him. Both were noticeably intoxicated and cursing loudly. They were placed under arrest, Ware by the defendant and Gregory by Skidmore, and all of them got in the station wagon. Neither Ware nor Gregory was handcuffed at that time. Gregory was put in the wagon by Skidmore, and Ware, who was a large man weighing about two hundred and sixty pounds, was, with some persuasion by both Skidmore and the defendant, placed in the vehicle. The arrests were made on or near a public street in a settled section of the town.

There were three parallel cross seats in the station wagon and a door in front and a door in the rear on each of its sides. Ware and Gregory were in the middle seat, Ware on the right and Gregory on the left. Skidmore and the defendant sat in the front seat, Skidmore on the left, as the driver, and the defendant on the right. With the four men occupying these positions, Skidmore drove the station wagon back across the river and through the business section for the purpose of placing Ware and Gregory in the

jail, which is located on high ground above and some distance beyond the central part of the town. The street approach to the jail is around and to the right of the passageway which leads directly up the hill to it. For this reason and because of the intoxicated condition of Ware and Gregory, and the manner in which Ware was acting, the officers approached the jail with them in the station wagon instead of using on foot the walkway up the hill. At the time of his arrest Ware told the officers they were "not enough" to put him in jail and that he would kill both of them.

On the trip from the place of the arrest toward the jail Ware repeatedly abused and cursed Skidmore and threatened to kill him unless he, Ware, was taken to his wife. Ware continued to call Skidmore vile names and Gregory from time to time reminded Ware that he was being taken to jail and that the officers were not taking him home to his wife. Ware, however, made no attempt to carry out his threats until the station wagon came to within a distance of four hundred to five hundred feet from the jail at a point near the Methodist Church. At that place, and just after Skidmore had turned the station wagon into the street which led to the jail, Ware, who was unarmed, suddenly struck the defendant a violent blow apparently with his fist. When struck the defendant was sitting sideways on the front seat, a position in which he had been riding during the trip and which enabled him to look at Ware in the seat behind him, and he had his night stick in his right hand. The force of the blow sent the defendant against the front door on his right and caused it to open. The defendant was knocked through the opening and he clung to the side of the station wagon which Skidmore stopped in a distance of a few feet. Skidmore immediately got out on the left side, and came around the front of the car to join the defendant who was outside it on the right side. The defendant told Skidmore to handcuff Ware. Skidmore opened the rear right door and while standing in the street, with the upper part of his body extending into the car through the open doorway, attempted to put handcuffs

on Ware who was in the space between the middle seat and the front seat. The defendant, who had lost possession of the night stick when he was first struck by Ware, undertook to assist Skidmore in handcuffing Ware. While so engaged the defendant was standing in the street with his head and shoulders inside the car and through the space of the open front door. At this time Ware was striking at both officers. After Skidmore had put one handcuff on Ware's right wrist and while the defendant was trying to get Ware's left arm in position to place the other handcuff and couple them, Ware freed his right arm and struck the defendant on the side of the head with the handcuffs. In the struggle the defendant fired a shot with his revolver which he had taken from its holster with his right hand. The bullet entered the front of Ware's body about two and one half inches below the lowest frontal rib and caused his death, which occurred within a few minutes after the wound was inflicted.

Gregory did not participate in the struggle and while it was going on neither he nor Ware got out of the station wagon.

Skidmore, called as a witness by both the State and the defendant, and Gregory and the defendant were the only eye witnesses to the entire affair who testified at the trial. Gregory testified that he was intoxicated and that he did not remember any conversation or anything about the shooting.

The substance of Skidmore's version of the affray is contained in these answers to questions by one of the attorneys for the State:

"A. We was driving around—drove around the turn—the sharp turn—and headed towards the jail. Ware struck Reppert somewhere along the side of the head and knocked him practically out of the car, was the reason of stopping. I drove, I would say, approximately three feet after I discovered that had went off, and I came around from the

driver's side in front of the vehicle to the side that Reppert was on, and by the time I got around there Reppert was out on his feet and had told me to handcuff that man three or four times, which I immediately taken my handcuffs from the case, opened the door back of the driver or the driver's seat which Reppert—back from where Reppert was sitting, and proceeded to try to put the handcuffs on Ware. He was cursing and fighting, and I finally got one handcuff on his right hand and he was striking at me and Reppert both, and during the fight and the scuffle I was in and—well, that is, my head was in and out of the vehicle at different times, dodging to keep from being struck, and Reppert was in the front set with the front door—as you saw downstairs, the door opens to the right—and Reppert was with his back somewhere near the—his back to the door, and was reaching across the front seat trying to help me handcuff—put the cuff on the other hand, and during the scuffle and the fight the shot was fired, and we continued to try—Ware continued to struggle and fight for a short time, but we finally got the handcuff on the other hand. And I taken Olen Gregory from the opposite side of where Ware was seated and put him into the back seat of the station wagon and came back around the back of the vehicle and got in and drove immediately to the jail, and Ware was in the same seat that he was seated in to start with, and I taken Gregory out. I took him and practically run him right on up to the jail and locked him up without searching him or anything, and Reppert was trying to get hold of a doctor—Doc Hunter—when I came back he was still trying to get hold of him, and he gave me the phone and said something I don't recall, to try him or try to get him, or something in that manner, and I proceeded to get Doc Hunter, which I located him. Q. Now, who fired the shot that took Ralph Ware's life? A. Reppert. Q. That is the defendant in this case? A. Yes, sir."

The defendant's account of the fight and the shooting is, in substance, given in these answers to questions propounded to him at the trial: "A. * * * After we made that turn we came a few yards, I don't know exactly how far.

I had the night stick in my right hand—the abuse was going on—to protect the driver. And after we got over there a little piece, he was cursing Skidmore, and I was struck between the middle of the back of my head and my left ear. * * *. Q. Do you know what that blow was with, whether it was the fist or what? A. I don't. * * *. Q. Now, state to the jury the effect of that blow that you just stated was struck by Mr. Ware and landed on the back of your head. What did it do to you? That is what I want to know. A. The blow—I was sitting that way—knocked me out into the street—knocked me out into the street. I caught by hanging on, and caught to the station wagon, and was drug some distance. * * *. Q. Now, then, immediately after you got that blow where did you find Skidmore or what did he do? A. I said, 'Let's handcuff that man,' meaning Ware. Q. You still haven't answered my question as to what Mr. Skidmore did. That is what I am trying to get to. A. Mr. Skidmore got around, and we started to get around to him to get him in a position where we could handcuff him. He got a handcuff on his right hand. Q. Mr. Reppert, who put that handcuff on his right hand? A. Charley Skidmore. Q. And were you trying to do anything with reference to Mr. Ware at the time that Mr. Skidmore put that handcuff on his right wrist or right arm? A. I was. I was trying to get the left over where they would couple, where he could be handcuffed. * * *. Q. Were you struck any more blows of any force? A. After the one handcuff was on, he tore that arm loose that had the handcuff on from Charley Skidmore, the other policeman; he got that loose over against the side and walloped me across the side of the head there with the handcuffs. Q. What effect did that blow have on you? A. That dazed me. * * *. Q. What did you do, if you know? I am trying to ask what you did with your pistol. A. I got hold of the pistol because I had no other weapon other than that. I intended to hit Ware with the pistol. Q. Did you have any intention of shooting or wounding Mr. Ware at that time? A. I did not. Q. Do you know what occurred? A. I do not. Q. Did you make any effort—conscious effort—at that time to fire the pistol at Mr. Ware. A. I did not. I didn't aim the gun. I

never remember pulling the trigger. * * *. Q. * * *. Were you conscious at the time? A. I was not."

Two witnesses produced in behalf of the State gave partial accounts of the shooting which differ from these statements of Skidmore and the defendant. One of these witnesses, a man of rather questionable reputation locally as a frequent misdemeanant and a liquor addict, testified that he came, in company with an intoxicated companion, within a distance of fifty to seventy feet of the station wagon which at the time was parked on the wrong side of the street just opposite the Methodist Church; that he saw the defendant standing outside the car at the back door on the right hand side and at that time the shot was fired; that Skidmore then got out of the car and walked round the front end to the place where "Roy was"; that they stood there a "little bit"; that he heard a man moaning but he could not see who it was; that Skidmore then got under "the wheel of the car"; and that "they drove away" in the direction of the jail. The testimony of this witness was contradicted by a witness offered by the defendant who testified that the witness had previously told him a different story about the shooting. The other witness, a woman who lived in an upstairs apartment in a building directly opposite the church, testified that when she heard loud voices on the street, between nine thirty and ten o'clock on the night of September 13, 1947, she walked from the living room to the bedroom and as she approached the window she heard a shot. She then went to the window and saw on the street below a parked station wagon and a policeman standing outside it. She heard someone say: "Put them on him: put them on him", and "Be still or I will give it to you again". She went from the window to the living room and back to the window and at that time the station wagon "was being driven away". As to the testimony of this witness with respect to the statements which she heard, the defendant testified that he had no recollection or knowledge that he ever made any of them and that he did not hear Skidmore utter them.

The evidence disclosed that Ware had previously said that Skidmore was a crook, that "he would compare Reppert with a crook or he would not work with" Skidmore, and that "he might give him to an undertaker but he would never put him in jail". It also disclosed that Ware was a large man, five feet eleven inches in height, weighing about two hundred and sixty pounds and was possessed of great physical strength; that he was unruly when under the influence of intoxicating liquor; that he and Gregory had drunk a fifth of liquor and they and another man had consumed two of three "fifths of wine" during the early part of the evening of the day of the shooting; that Ware and Gregory were both grossly intoxicated when arrested at a public place in the town; that Ware, who was fifty one years of age, had been ill and was not in good health at the time of his arrest; that Skidmore was six feet in height, weighed two hundred and thirty pounds and was thirty five years of age; that the defendant was five feet eleven inches in height, weighed one hundred and seventy six pounds, and was fifty nine years of age; that there had never been any previous trouble between Ware and Skidmore or between Ware and the defendant; and that the defendant entertained no ill will toward Ware and did not fear him during the trip from the place of the arrest before the affray in which Ware was shot occurred. Several witnesses produced in behalf of the State testified that Ware's reputation as a peaceable and law abiding citizen in the community was good.

Twenty five separate errors, most of them dealing with specified defects in and omissions from the written charge given by the court in lieu of all instructions offered by the State and by the defendant, are assigned by the defendant as grounds for reversing the judgment of the circuit court. The substance of these numerous assignments may be considered under these heads: (1) The verdict of guilty of voluntary manslaughter is not supported by the evidence; (2) the court should have given certain instructions offered by the defendant; (3) the court erred in its charge to the jury: (a) in omitting the element of intent in de-

fining the offense of voluntary manslaughter; (b) in incorrectly instructing the jury with respect to the presumption of innocence of the defendant; (c) in refusing to instruct the jury as to the rights and the duties of the defendant as an arresting officer in overcoming resistance by Ware while he was in the lawful custody of the defendant; (d) in refusing to instruct the jury that if the killing of Ware by the defendant was accidental the jury should acquit the defendant; (e) in instructing the jury that a person is presumed to intend that which he does or is the necessary consequence of his act; and (f) in referring specifically to the defendant as a competent witness and instructing the jury to weigh and consider his evidence in the same manner as the jury should weigh and consider the evidence of other witnesses; and (4) certain remarks of the prosecuting attorney were prejudicial to the defendant.

These assignments will be dealt with in the order in which they have been stated.

It is unnecessary to discuss at length the first assignment relied on by the defendant. Some of the material facts, those which show that Ware was unarmed, that he was not outside the station wagon from the time he was placed in it after his arrest until he was shot by the defendant, that he and Gregory were intoxicated and were in that condition when arrested in a public place, that Ware was abusive and uttered repeated threats, that neither Skidmore nor the defendant feared that he would attack them, that the struggle occurred in the station wagon and that the defendant fired the shot which caused Ware's death, are not disputed. On the material questions whether the defendant intended to shoot and kill Ware, whether he knew what he was doing when he fired the shot, and the manner in which the shooting occurred, the evidence is conflicting. Upon the facts and the circumstances disclosed by the evidence, disputed and undisputed, the jury has found the defendant guilty of the crime of voluntary manslaughter. To resolve the conflicts which appear in the evidence is the peculiar and exclusive prov-

ince of the jury. It is obvious that the jury believed, from the evidence, despite the conflicts disclosed by the proof, that the defendant knew what he was doing when he discharged his revolver and that he intended to shoot Ware when he fired the shot that killed him. The evidence is sufficient to lead the jury to believe, beyond reasonable doubt, that the defendant was guilty of voluntary manslaughter and to justify his conviction of that offense, and its finding in that respect will not be disturbed by this Court. *State v. Male,* 103 W. Va. 355, 137 S.E. 751. "In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the accused beyond a reasonable doubt, though the evidence adduced by the accused is in conflict therewith. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done." *State v. Bowles,* 117 W. Va. 217, 185 S.E. 205; *State v. Hacker,* 130 W. Va. 91, 42 S.E. 2d 559. See also *State v. Taylor,* 130 W. Va. 74, 42 S.E. 2d 549; *State v. Holmes,* 125 W. Va. 97, 23 S.E. 2d 61; *State v. Gunter,* 123 W. Va. 569, 17 S.E. 2d 46; *State v. Barkoski,* 96 W. Va. 265, 122 S.E. 654; *State v. Price,* 94 W. Va. 644, 119 S.E. 874; *State v. Mc-Laughlin,* 91 W. Va. 654, 114 S.E. 278; *State v. Cook,* 81 W. Va. 686, 95 S.E. 792; *State v. Henry,* 51 W. Va. 283, 41 S.E. 439.

Review of the action of the trial court in refusing certain instructions offered by the defendant requires consideration of the contents and the subject matter of the charge and the substance of the rejected instructions which the court refused to incorporate in it, and for this reason the assignment of error relating to the refusal of the instructions and that directed to the asserted defects in and omissions from the charge may be considered and disposed of together.

In defining the crime of voluntary manslaughter the trial court, in its charge, used this language: " * * * voluntary manslaughter is when one person unlawfully kills another person without malice, but under sudden excitement and heat of passion;". This statement of the substance of the offense omits the element of intent of the person who commits the act which causes the death of another person, and the defendant attacks that portion of the charge as a prejudicially incorrect statement of the essential elements of the crime of voluntary manslaughter of which he was convicted. This contention of the defendant is well founded. Though in other parts of the charge the court twice mentioned the effect of the intentional action of the defendant with respect to his guilt or innocence, it did so in one instance in instructing the jury in relation to the elements of murder of the second degree of which the defendant was acquitted and in the other instance in telling the jury that if the jury believed that the defendant was not able to form, or did not form, "any intention of shooting said Ware, then said shooting was excusable, and you should find the defendant not guilty". In the recent case of *State v. Foley*, 131 W. Va. 326, 47 S.E. 2d 40, this Court expressly held, in Point 4 of the syllabus, that "The offense of voluntary manslaughter involves an intent to kill; and an instruction or charge to a jury defining such offense, which omits any reference to intent as an element of the offense, is presumed to have been prejudicial to a defendant being tried on an indictment under which he might be convicted of that offense, and constituted reversible error." The use of the word intentional in the charge, in the manner indicated, does not satisfy the requirement of the *Foley* case that a definition of the crime of voluntary manslaughter must include intent as an element of the offense. The rule of that case is directly applicable here and requires reversal of the judgment of the trial court. See also *State v. Weisengoff,* 85 W. Va. 271, 101 S.E. 450.

The defendant offered an instruction, No. 15, which would have told the jury that "the presumption of inno-

cence is not a mere form, to be disregarded by the jury at pleasure, but it is an essential and substantial part of the law of the land and binding on the jury in this case", and that, by virtue of the presumption, the jury should acquit the defendant unless the jury felt compelled to find him guilty under the law and evidence which convinced the jury of his guilt beyond all reasonable doubt. The instruction correctly states the law and should have been given unless its substance is embodied in the charge. See *State v. Boggs,* 129 W. Va. 603, 42 S.E. 2d 1. The requirement of proof of the guilt of the defendant is fully and correctly covered by the charge; but the defendant insists that the language of the charge does not satisfy the equally important requirement of a full and correct statement of the presumption of his innocence. In the charge the court dealt with this fundamental and universally recognized principle of law in these words: "All presumptions, except as otherwise stated, are in favor of the innocence of the prisoner, and every person is presumed to be innocent until he is proven guilty beyond all reasonable doubt. This presumption of innocence is not a mere matter of form, but is a substantial part of the law of the land and goes with the prisoner throughout every stage of the trial." The court then proceeded to explain the meaning and the effect of the presumption and stated, in substance, that the force of the presumption existed only until the contrary sufficiently appeared from the evidence and that it was the province of the jury to determine, from the evidence and the circumstances in the case, whether the presumption should yield its strength and, if so, to what extent. Though that particular portion of the charge is somewhat abstract, it does not have the effect, as the defendant contends, of impairing the sufficiency of the quoted statement which informed the jury of the existence and the character of the presumption. The presumption of innocence has been characterized as a legal presumption, *Garner v. Commonwealth,* 186 Va. 600, 43 S.E. 2d 911, and as a fundamental principle of criminal law, 20 Am. Jur., Evidence, Section 222; *Potts v. Commonwealth,* 113 Va. 732, 73 S.E. 470; and this Court has said that a presumption of

law is a rule of law that a particular inference shall be drawn by a court or a jury from a particular circumstance. *Holley v. Purity Baking Company,* 128 W. Va. 531, 37 S.E. 2d 729, 167 A. L. R. 648; *State v. Dodds,* 54 W. Va. 289, 46 S.E. 228. Whether the presumption of innocence be considered as evidence, as some courts hold, which, according to the weight of authority, in reality it is not, or as a rule of law which requires proof of the guilt of the accused, as in reality it is, its protective force may, of course, be overcome by evidence which establishes such guilt beyond all reasonable doubt. 22 C. J. S., Criminal Law, Section 581; 20 Am. Jur., Evidence, Section 223; 16 C. J. 534 to 537; *State v. Boswell,* 194 N. C. 260, 139 S.E. 374; *Garner v. Commonwealth,* 186 Va. 600, 43 S.E. 2d 911; *Potts v. Commonwealth,* 113 Va. 732, 73 S.E. 470; *Commonwealth v. Russogulo,* 263 Pa. 93, 106 A. 180; *Miller v. Commonwealth,* 181 Va. 906, 27 S.E. 2d 57; *Miller v. Commonwealth,* 172 Va. 639, 2 S.E. 2d 343; *Elliott v. Commonwealth,* 172 Va. 595, 1 S.E. 2d 273; *Dotson v. Commonwealth,* 171 Va. 514, 199 S.E. 471; *Sutherland v. Commonwealth,* 171 Va. 485, 198 S.E. 452. If this were not so, it would not be possible to convict a defendant in any case, regardless of the force, the clarity, or the otherwise unquestioned sufficiency of the evidence of his guilt. The language of the charge, in its entirety, on this point, or the refusal of the court to give the foregoing instruction, did not prejudicially affect any right of the defendant.

The defendant offered four instructions, No. 21, No. 22, No. 23 and No. 29, concerning the rights and the duties of an officer to arrest a person who commits a misdemeanor in his presence and to prevent his escape from the custody of an arresting officer. All these instructions were refused by the court and this action is assigned as error. Careful examination and consideration of these instructions, which need not be quoted or summarized in this opinion, indicate clearly that none of them contained a complete or correct statement of the law relating to that subject. For that reason the trial court was justified in its refusal to

give them to the jury or to incorporate them in the form submitted in its written charge. The defendant, however, was entitled to a correct statement of the law on this question in the charge given by the court in lieu of instructions. This the written charge clearly does not do. Instead of instructing the jury with respect to the right of the defendant, as an officer, to use such force as should be necessary, even to the extent of taking the life of a prisoner in his lawful custody, in overcoming resistance of the prisoner, when the officer believes, upon reasonable grounds, that he is in grave danger of death or great bodily harm, the charge deals merely with the right of self defense of the defendant as a private person, and contains no reference to the special protection which the law affords an officer in making a lawful arrest of a misdemeanant or in preventing the escape of a prisoner lawfully in his custody.

In making an arrest and in overcoming resistance offered by a prisoner lawfully in his custody an officer can, of course, avail himself of the usual right of self defense which permits any person to use such force as may be necessary to protect himself from grievious bodily harm or loss of life. The charge properly instructed the jury on this right of the defendant, although the evidence given by him, in which he admitted that he did not fear Ware and in which he asserted that he did not know what he was doing when he fired the fatal shot, eliminates from the case self defense as a justification for the act of the defendant in causing the death of Ware. If the defendant did not expect an attack or fear Ware, who was unarmed, and who, apparently because he was not believed to be dangerous, had not been handcuffed before the fight, and if the defendant, by his own positive declaration was unconscious and did not know what he was doing when he fired the shot that killed Ware, he could not have believed, upon reasonable grounds, that it was necessary, to protect himself from death or grave bodily harm, to take Ware's life. Even though these statements of the defendant as to his dazed condition were not accepted by the jury, as indi-

cated by its verdict of guilty, they established his own personal notion or perception of the situation which existed at the time the shot was fired and deprive him of the excuse of self defense, an essential element of which, in any case is that the person who kills his assailant with a deadly weapon must have had reasonable grounds to believe, and must have believed, that the danger was imminent and that the killing was necessary to preserve his own life or to protect himself from great bodily harm. *State v. Hamrick,* 74 W. Va. 145, 81 S.E. 703; *State v. Lutz,* 85 W. Va. 330, 101 S.E. 434; *State v. Long,* 88 W. Va. 669, 108 S.E. 279.

The protection, which an officer is entitled to receive, in making a lawful arrest or in preventing the escape of a person lawfully in his custody, is a different thing from self defense, and, because he must of necessity be the aggressor, and must press forward and accomplish the arrest or prevent the escape of the prisoner, the law gives him special protection. See 4 Am. Jur., Arrest, Section 78; *State v. Stockton,* 97 W. Va. 46, 124 S.E. 509; *State v. Weisengoff,* 85 W. Va. 271, 101 S.E. 450.

When arresting a person who commits a misdemeanor, an officer is not compelled to retreat when he is resisted, but may use such force as will enable him to overcome the resistance offered even to the extent of taking the life of the offender, if he is actually resisting to the extent of placing the officer in danger of his life or of great bodily harm. 4 Am. Jur., Arrest, Sections 73 and 78. Whether the officer uses more force than is reasonably necessary to perform the duty imposed upon him by law is, of course, a question to be determined by the jury in any particular case; but his conduct must be weighed in the light of the circumstances in which he acted at the time and not measured by subsequently developed facts. *Village of Barboursville ex rel. Bates v. Taylor,* 115 W. Va. 4, 174 S.E. 485, 92 A. L. R. 1093; *Thompson v. Norfolk and Western Railway Company,* 116 W. Va. 705, 182 S.E. 880. In *State v. Murphy,* 106 W. Va. 216, 145 S.E. 275, in stating the law governing the conduct of an officer in making an arrest of

a misdemeanant or in preventing the escape of a person under lawful arrest who offers resistance to the officer, this Court said in the syllabus: "In making a lawful arrest of a misdemeanant, or in preventing the escape of one under arrest, an officer is justified in taking the life of the misdemeanant when he is resisted by him in such manner, that the officer believes, upon reasonable grounds, that he is in danger of death or great bodily harm." The absence from the charge of any instruction relating to the protection which the law accords to an officer in preventing the escape of a person lawfully in his custody, or to the right of an officer when attacked by a misdemeanant in his lawful custody, within the principle stated in the quoted syllabus in the *Murphy* case, was prejudicial to the defendant and constituted reversible error.

Instruction No. 27, offered by the defendant and refused by the court, would have told the jury that if the jury believed from the evidence that Ware was accidentally killed on September 13, 1947, by the defendant, the jury should find the defendant not guilty. The substance of this instruction was omitted from the charge, which is silent on that point. In *State v. Legg,* 59 W. Va. 315, 53 S.E. 545, 3 L. R. A. (N.S.) 1152, this Court held that an instruction in substantially the same form as that offered by the defendant should have been given and that the refusal of the court to give it was reversible error. In this case the defendant testified that he did not intend to shoot Ware; that he did not aim the revolver at him or remember pulling the trigger; and that his only purpose in using the revolver was to hit Ware with it because he was without any other weapon. This evidence was sufficient to justify the reasonable inference by the jury that the defendant killed Ware by accident rather than by design even though it found adversely to this contention of the defendant. Despite the finding of the jury, however, the evidence on that issue was sufficient to form the basis for the instruction, and the action of the court in refusing to give it and in omitting its substance from the charge was prejudicial error.

Another instruction, No. 11, offered by the defendant, was in this form: "The Court further instructs the jury that the defendant Roy B. Reppert is a competent witness in his own behalf; and you should weigh and consider his testimony in accordance with the same principles that should actuate you in weighing and considering the testimony of other witnesses in this case." The court refused the instruction but embodied its exact language in the written charge and added the following: "And the court further instructs the jury that you have no right to arbitrarily disregard or reject his testimony merely because he is the defendant on trial and charged with the offense in this case, nor should you arbitrarily disregard the testimony of any other witness in the case." The defendant argues that the inclusion of this additional statement in the charge confused the defendant with other witnesses with respect to the right of each to testify and destroyed the effect of the language of the instruction as offered. There is no merit in this contention. As already stated, the court adopted the language used by the defendant in the instruction submitted by him which correctly stated that the jury should weigh and consider the testimony of the defendant in the same way as the jury should weigh and consider the testimony of other witnesses. The defendant as a competent witness is entitled to exactly the same treatment by the jury as any other competent witness. See *State v. Green,* 101 W. Va. 703, 133 S.E. 379; *State v. Male,* 103 W. Va. 355, 137 S.E. 751. In *State v. Koski,* 100 W. Va. 98, 130 S.E. 100, an instruction which told the jury that it could not arbitrarily disregard or reject the testimony of the accused was approved as a proper instruction. By adding to the instruction offered by the defendant the admonition that the jury should not arbitrarily disregard or reject the testimony of the accused or of any other witness, the court, in the charge, manifestly did not restrict any right of the defendant as a witness, but on the contrary merely gave the defendant the additional unasked protection to which he was entitled.

This portion of the charge was clearly not prejudicial to the defendant.

The defendant complains of that part of the charge which told the jury that "a person is presumed to intend that which he does or which is the necessary consequences thereof". The quoted language was immediately followed by these words: "wherefore, if you believe from the evidence beyond reasonable doubt that the defendant, Roy B. Reppert, intentionally shot and killed the deceased, Ralph Ware, with a dangerous and deadly weapon, fired by his hand, the presumption of the law is that such shooting was prima facie attended with malice entering into murder, and without further showing, is murder of the second degree." This statement in the charge dealing with the crime of murder need not be considered in detail for the reason that under the more recent decisions of this Court when there has been a conviction of a lower degree of an offense, which is sustained by the evidence, an instruction dealing with a higher degree of the offense, though erroneous, becomes immaterial and harmless. *State v. Barker,* 128 W. Va. 744, 38 S.E. 2d 346; *State v. Bowles,* 117 W. Va. 217, 185 S.E. 205; *State v. Stanley,* 112 W. Va. 310, 164 S.E. 254; *State v. Johnson,* 108 W. Va. 630, 152 S.E. 203. As the verdict in this case expressly found the defendant not guilty of murder of either the first or second degree, but found him guilty of the lesser offense of voluntary manslaughter, this Court will not consider an instruction which deals with the elements of the crime of murder of the second degree. *State v. Bowles,* 109 W. Va. 174, 153 S.E. 308.

The expression that a man is presumed to intend that which he does or which is the immediate or necessary consequence of his act in an instruction which is proper in other respects in the trial of an accused on an indictment for murder has been considered and approved in numerous decisions of this Court since its incorporation in the initial clause of an instruction which was held to be correct in Point 11 of the syllabus in *State v. Cain,* 20 W. Va. 679.

For the use of these words or their equivalent in an instruction in the trial of an indictment for murder, see *State v. Hedrick,* 99 W. Va. 529, 130 S.E. 295; *State v. Tucker,* 52 W. Va. 420, 44 S.E. 427; *State v. Sheppard,* 49 W. Va. 582, 39 S.E. 676; *State v. Dickey,* 46 W. Va. 319, 33 S.E. 231; *State v. Staley,* 45 W. Va. 792, 32 S.E. 198; *State v. Welch,* 36 W. Va. 690, 15 S.E. 419; *State v. Schnelle,* 24 W. Va. 767. In speaking of the rule which applies to these words in an instruction this Court says in the opinion in *State v. Sheppard,* 49 W. Va. 582, 39 S.E. 676: "The impossibility of ascertaining the secret intent existing in the mind and heart of the accused, when shown to have given a mortal blow, and of ascertaining and disclosing what mental functions were performed by him in the execution of the act, is recognized and provided for in this rule. * * * It is not true that a man always intends that which he does or that which is the immediate or necessary consequence of his act, and the law holds no man to such responsibility. It does presume, however, that he so intends it, but it allows him, if he can, to rebut or overthrow that presumption." The trial court, in embodying in the charge the words "a person is presumed to intend that which he does or which is the necessary consequences thereof;" stated the law with substantial accuracy and, in the light of the evidence, did not prejudice any right of the defendant. See *Davis v. Commonwealth,* 150 Va. 611, 143 S.E. 641.

Instruction No. 18, offered by the defendant and refused by the court, would have told the jury, in substance, that if Ware committed the offense of being grossly intoxicated in a public place in the presence of the defendant and Skidmore in the Town of Addison, they, being police officers of that municipality, had the right to make a lawful arrest of Ware, and that Ware had no right to resist such arrest either when taken into custody or while being transported to the jail. The court incorporated in the charge the substance of this instruction except that portion which negatived any right of Ware to offer resistance. Of course Ware did not have the right to resist

the defendant in lawfully arresting him or while he was in the lawful custody of the defendant after the arrest. *State v. Weisengoff*, 85 W. Va. 271, 101 S.E. 450; *State v. Long*, 88 W. Va. 669, 108 S.E. 279. The court should have included in the charge the omitted portion of the instruction and its refusal to do so was error.

The instructions offered by the defendant and refused by the court, the substance of which was omitted from the charge, have been carefully examined. As to the instructions which have not received particular comment, it does not appear that the action of the trial court in refusing to give any of them in the form submitted or to incorporate their substance in the charge has resulted in any prejudice to any right of the defendant. For this reason it is unnecessary to discuss any of them in detail in this opinion. Several of the refused instructions, and various parts of the charge, relate to the elements of murder of either the first or second degree and the character of the proof requisite to a conviction of each of those crimes, and those instructions and those portions of the charge are rendered immaterial by the verdict of guilt of the lesser offense of voluntary manslaughter.

The final assignment of error to be considered relates to a remark of the prosecuting attorney in his closing argument to the jury. The statement complained of contains these words: "If, during my term as prosecuting attorney of Braxton County, any of our officers shoot a man who is intoxicated, I will do what I can as prosecuting attorney, and as is my duty, to see that he is promptly indicted and prosecuted and punished with the extreme penalty." This utterance was wholly uncalled for and was entirely irrelevant to any issue in the case. It was, however, merely an extravagant expression of his casual estimate of the scope of his duties as a prosecuting officer. It did not reflect any discredit upon the accused or any witness, or belittle or find fault with any evidence produced in his behalf, or indicate any lack of fairness or impartiality toward him. Whether the action of the trial court, upon a second ob-

jection by counsel for the defendant, in instructing the jury not to consider the remark "as evidence", sufficiently excluded it from the jury, need not be determined, as it does not appear that any possible prejudice toward the defendant resulted from its utterance. "Counsel necessarily have great latitude in the argument of a case, and it is, of course, within the discretion of the court to restrain them; but with this discretion, the appellate court will not interfere, unless it clearly appears from the record that the rights of the prisoner were prejudiced by such line of argument." Point 6, Syllabus, *State v. Allen,* 45 W. Va. 65, 30 S.E. 209. See *State v. Shores,* 31 W. Va. 491, 7 S.E. 413, 13 Am. St. Rep. 875; *State v. Cooper,* 74 W. Va. 472, 82 S.E. 358, Ann. Cas. 1917D, 453; *State v. Boggs,* 103 W. Va. 641, 138 S.E. 321. The action of the trial court in directing the jury not to consider the statement as evidence, and in not entirely excluding it, did not amount to an abuse of its discretion or result in any injustice to the defendant.

For the reasons stated and because of the errors occurring in the trial, as indicated, the judgment is reversed, the verdict is set aside, and a new trial is awarded the defendant.

> *Judgment reversed;*
> *verdict set aside;*
> *new trial awarded.*

LOVINS, JUDGE, concurring:

I concur in the reversal of this case and agree with the holdings set forth in the opinion of the Court, except that relating to the presumption of innocence. The charge of the court relating to that principle may be divided into two parts:

First: "* * * All presumptions, except as otherwise stated, are in favor of the innocence of the prisoner, and every person is presumed to be innocent until he is proven guilty beyond all reasonable doubt. This presumption of innocence is not a mere matter of form, but is a substantial part of the law of the land and goes with the prisoner throughout every stage of the trial."; and

Second: "In this connection, and in relation to the foregoing presumption and other presumptions later mentioned in this charge, the term 'presumption' is used to imply that a fact or set of facts sufficiently appearing on the evidence is considered sufficient evidence of some other fact in the absence of specific evidence to the contrary. This contrary proof may be a conflicting presumption or evidence or other incident in the trial submitted to the jury for their consideration in arriving at a verdict; and, it is for the jury alone to find from the specific evidence and circumstances of the case whether such presumption should yield its strength, and, if so, to what extent; it being the mission of such presumption to serve its purpose only until the contrary sufficiently appears from the evidence introduced into the case; and having due regard, always, to the respective burdens cast upon the state and the defendant as to the measures of proof depending on each, it will be your duty to, accordingly, consider all the evidence upon which the so-called presumptions rest, the presumptions as above described and all the specific evidence and circumstances introduced in the case for your consideration, and in the light of the instructions given you by the court, arrive at a just and true verdict thereon, if you find yourselves in agreement in that regard."

The first statement is a concise and correct statement of the law relating to the presumption of innocence of a defendant in a criminal trial. Of course, such presumption may be overcome by evidence of guilt beyond all reasonable doubt.

But the second quoted portion of the court's charge is uncertain, vague and abstract. It virtually emasculates the correct part of the court's charge. It is my opinion that the settled principle of law relating to the presumption of innocence should not be qualified, explained away or destroyed by abstractions and uncertainties such as, in my opinion, appear in the second part of the court's charge above quoted.

For that reason I believe it was error to give the second part of the court's charge. Otherwise I am in agreement with the opinion.

Fox, Judge, dissenting:

I dissent from the decision of the majority in this case. I do so for the reason that in my opinion the .defendant has had a fair trial. He has received the judgment of his peers on the charges against him, and has assigned no error which, in my judgment, prejudiced his defense. The trial may not have been a perfect one—few are—, but a defendant charged with a criminal offense may not insist on a perfect trial.

There may be some confusion respecting the application of the presumption of prejudice where error has been committed in the trial of a criminal case, and the rule that to justify the reversal of a judgment entered on a jury verdict, it must appear that error committed was material and prejudicial to the defendant. In 1 Michie's Jur., 724, it is stated: "Error will be presumed prejudicial unless it plainly appears that it could not have affected the result. A plaintiff in error must always show, not only error in the rulings of the trial court, but also error of a substantial nature. When once he has pointed out an error of a substantial character, he is entitled to have it corrected if it appears from the record that there is reasonable probability that it did him any harm. There is no presumption that error is harmless." On the other rule it is stated in the same volume, at page 717: "It is established by a multitude of cases where it clearly appears affirmatively that an error of the lower court could not affect the merits of the case, nor in any way be prejudicial to the party appealing, the appellate court will not reverse the judgment on the ground of such error. This applies to criminal as well as to civil cases. But in a criminal prosecution the doctrine of harmless error obtains only when it clearly appears that accused has had a fair trial according to law and the proof is conclusive of his guilt. If either of these elements is lacking, then the accused has not been accorded the

rights guaranteed him under the provisions of the statute and organic law."

That the rule last stated applies to criminal cases, is attested by the decisions of this Court in the following cases: *State v. Lane,* 44 W. Va. 730, 29 S.E. 1020; *State v. Rush,* 108 W. Va. 254, 150 S.E. 740; *State v. Corey,* 114 W. Va. 118, 171 S.E. 114; *State v. Smith,* 119 W. Va. 347, 193 S.E. 573; *State v. Taylor,* 130 W. Va. 74, 42 S.E. 2d 549. In *State v. Rogers,* 80 W. Va. 680, 93 S.E. 757, it was held: "To obtain reversal of a judgment of conviction in a criminal prosecution, the accused must show that actual prejudice to him resulted from the proceedings in the trial court."

I am not in accord with the view which, in my judgment, is too widely prevalent, and of which the majority opinion is an example, that a person charged with crime is entitled to be protected by this Court against every error which often, through inadvertence, may creep into the trial, but which could in no reasonable view be considered as having prejudiced the accused before the jury. To use such harmless errors as an excuse for a new trial in a case where, as here, the evidence is held by the majority opinion to have fully justified the verdict, seems to me unwarranted. I would at all times give to a defendant in a criminal case the benefit of the constitutional and statutory guarantees designed for his protection, to the end that every element of a fair trial be assured to him; but I do not believe that minor and nonprejudicial errors committed in such a trial should be permitted to nullify a jury verdict returned in a fair trial. Perhaps it will be contended that courts do not intend to reverse judgments in criminal cases, where no prejudicial error has been committed, and I am willing to admit that courts often pay lip service to the proposition that harmless error is not a ground for reversal; but as a factual matter, on the general principle that error committed in the trial of such a case is presumed to be prejudicial, judgments are often, — too often —, reversed

and verdicts set aside for reasons which have no relation to the realities of the case; and this occurs in cases where the alleged errors could by no reasonable stretch of the imagination be said to have in any way operated to the prejudice of the accused.

I do not mean to say that the majority opinion in this case is founded on supposed error or errors which may be termed trivial or inconsequential. I think that in some cases similar errors might justify a reversal. I do contend, however, that under the facts of this case, and considering the trial court's charge as a whole, the errors on which the judgment is reversed could not have prejudiced the defendant; and that they do not constitute a sound basis for the reversal of the judgment complained of, and for setting aside the verdict of the jury.

The decision of the majority is based upon four grounds: (1) The failure to incorporate in the trial court's charge the element of intent in the definition of voluntary manslaughter; (2) that no instruction was given covering the admitted fact that defendant was an officer of the law at the time of the homicide involved; (3) that an instruction based upon supposed accidental killing should have been given; and (4) that an instruction was not given to the effect that defendant, as an officer of the law, had a right to arrest Ralph Ware, the victim of the homicide. These points will be considered in the order stated.

The State offered seventeen instructions and the defendant thirty-one, all of which were refused by the court; and, in lieu thereof, the court gave a charge intended to cover the entire case. In that charge the court, in defining the offenses of which the defendant might be convicted stated: "Voluntary manslaughter is when one person unlawfully kills another person without malice, but under sudden excitement and heat of passion * * *." It will be noted that the word "intentionally", or its equivalent, is omitted. Of course, intent is a necessary element of the

crime of manslaughter, and the definition of the offense should have included a reference to that element. It is true also that in the case of *State v. Foley,* 131 W. Va. 326, 47 S.E. 2d 40, this Court held that failure to incorporate the element of intent in an instruction on manslaughter was fatal. However, two members of the Court, while believing that the definition should have contained a reference to that element, did not think it was prejudicial error in that case. In my opinion, there is less reason for holding that there was prejudicial error in this case than there was in the *Foley* case, for the reason that here, in other parts of the charge, there is express reference to intent as an element of the crime. It is true that as to one reference the legal elements of murder are stated, the charge being: "If you believe from the evidence beyond reasonable doubt that the defendant, Roy B. Reppert, intentionally shot and killed the deceased, Ralph Ware, with a dangerous and deadly weapon, fired by his hand, the presumption of the law is that such shooting was prima facie attended with malice entering into murder, and without further showing, is murder of the second degree." But at another point in the charge it stated: "* * * if you further believe that while in the car of the said officers, being taken to jail, the said Ware attacked the accused defendant with force and violence and struck the defendant Reppert with handcuffs which the officer was endeavoring to place upon him; and that, because of said blow or blows by said Ware, the defendant Reppert was rendered unconscious or dazed and incapable of knowing what was being done, and that while so unconscious and incapable of directing his actions shot and fatally wounded the said Ware while endeavoring to subdue him and continue conveying him to jail, and you further believe that said Reppert was neither able to nor did form any intention of shooting said Ware, then said shooting was excusable, and you should find the defendant not guilty." The last quotation should be considered in connection with the defendant's defense in the case. The majority opinion holds that this was not a case of self-defense; and it also holds that

there was not sufficient evidence of an accidental killing to base a verdict on that theory, although sufficient to justify an instruction thereon. With these theories of defense eliminated, Reppert's only defense was that at the time he shot Ware he was unconscious; that he has no recollection of pointing the pistol or pulling the trigger; and, of course, had no intention of doing so. This being his defense, and the only defense recognized in the majority opinion, it seems to me that the instruction quoted above covers the case perfectly, and includes everything to which defendant was entitled. The instruction is specific on the point that if there was no intent, there was no guilt, as applied to the particular situation relied upon by defendant in the trial as a defense to the charge against him. This being true, the mere matter of the definition of the crime of manslaughter could not possibly have had anything to do with the jury's verdict. Evidently the jury did not believe the statement made by defendant that he was unconscious at the time he shot Ware, and did not believe that there was basis for the claim of self-defense.

The next point of reversal is that there was nothing in the charge given by the court which advised the jury of the so-called special privileges which an officer of the law may have in executing a criminal process. I think this position is answered by that part of the court's charge which reads as follows:

> "The court instructs the jury that the defendant being a police officer had the right to make an arrest of the deceased, Ralph Ware, if at the time and in the presence of the defendant the said Ware was guilty of a breach of the peace in making an affray, contending with angry words to the disturbance of the peace or appearing in a state of gross intoxication in a public place or otherwise disturbing the peace; and, the defendant also had the right, in a proper manner, to convey him to the mayor of the town to be dealt with for his misdemeanors, if any, or, if necessary, in the circumstances to convey him to, and confine him in, the jail. In the perform-

ance of these duties the defendant had the right, either alone or with his assistant policeman, to use such force as was reasonably necessary to effect such arrest and transportation; but, he had no right to resort to means and measures reasonably calculated and likely to cause the death of said Ware, in arresting and transporting him as mentioned; and, if he did so resort and as a result thereof, the said Ware met his death at the hand of the defendant, the defendant would not be held guiltless unless upon grounds aside from the fact that he was an officer of the town acting in his official capacity. Of the conduct of the defendant in the circumstances stated, the jury will determine from the evidence, giving to the defendant the benefit of all the evidence in the case, that of the state as well as for the defendant."

In the circumstances of this case, I do not think the trial court would have been justified in going farther on the point of an officer's rights and privileges. Of course, an officer of the law may be and usually is required to be on the offensive, and in the exercise of his duties may take action, which, were a private individual involved, might subject him to punishment under the laws of the land. But I have not understood that the law guarantees to any officer the right to go beyond the necessary steps to execute the process in his hands, or to arrest without process in certain circumstances. He may take the necessary steps to arrest a person charged with crime, or who commits a crime in his presence, and to incarcerate him. Of course, he has the right to protect himself against bodily harm, and does not have to retreat before taking the steps necessary to protect himself, even to the taking of human life. But when an officer armed with a deadly weapon, accompanied by another police officer likewise armed, both of whom had in charge and under arrest a drunken person, and while that drunken person was in an automobile and the two officers were standing outside that automobile, and one of them shoots the drunken prisoner, there does not seem to me to be any solid ground upon which the

privilege of an officer can be invoked. When the court instructed the jury that an officer had the right to make an arrest, and as to the other rights detailed in its charge, I think it went as far it was required to go in the circumstances of this case. The State protects its officers in the discharge of their duties, but it does not, and should not, protect them when they abuse their powers, and when, as in this case, as the jury must have believed, the defendant killed his prisoner while that prisoner was in a helpless condition, both because of his drunkenness, and his position in the automobile where he could not protect himself. In these circumstances there would seem to be no reason why the defendant should be permitted to excuse his offense merely because he was an officer of the law.

On the third point, I do not think there was sufficient evidence in this case to justify an instruction on the theory of accidental killing. I agree, of course, that if the killing was accidental, the verdict returned by the jury was not justified. The whole case shows that the real defense was an unintentional, as distinguished from an accidental, killing. It is not necessary to define the difference between the two terms. Defendant says that he was not conscious of any act at the time of the homicide, and we have the right to accept that statement as the basis of his defense, and to pursue that theory to its natural result.

On the point of failure to incorporate in the general charge an instruction that defendant, as an officer of the law, had the right to make the arrest, and that Ware had no right to resist arrest, I need only refer to that part of the court's charge which specifically states that the "defendant being a police officer had the right to make the arrest of the defendant, Ralph Ware, if at the time and in the presence of the defendant the said Ware was guilty of a breach of the peace * * *." The statement of the right of the officer to make an arrest necessarily implies that there can be no right to resist. The majority opinion does not say that the refusal to refer to this matter a second

time was prejudicial error; but simply states it was error. The jury was entitled to know that defendant had the right to make this arrest, and in specific terms the court advised it of that right, and it was not necessary to repeat the charge on that point.

I think this is a case where defendant has had a fair trial. The majority opinion admits that the verdict is justified by the evidence. On the sole substantial ground of defense, that of unintentional killing, the jury was plainly instructed that if intent to kill did not exist, there could be no conviction. The right of defendant as a police officer to make the arrest was fully recognized and the jury so charged. There was no evidence of accidental killing, and therefore an instruction on that theory was not required to be given. The only technical error in the case was the failure of the court properly to define manslaughter and that, in my opinion, was effectually cured by another part of the charge given by the court, and the original error made harmless.

For these reasons I would affirm the judgment complained of.