STATE OF WEST VIRGINIA

*v.*

J. J. MULLINS

(No. 10256)

Submitted September 26, 1950. Decided November 28, 1950.

*G. C. Belknap, Henry McLane,* for plaintiff in error.

*William C. Marland,* Attorney General, *Thomas J. Gillooly,* Assistant Attorney General, for defendant in error.

Fox, Judge:

On the 3rd day of June, 1947, a grand jury attending the Circuit Court of Clay County, returned an indictment against J. J. Mullins charging him with the murder of one Noah Chapman, Jr. At the June term, 1949, the case was called for trial, and a demurrer to the indictment was overruled, to which the defendant excepted at the time. The defendant then entered his plea of not guilty and a trial was had, resulting in the failure of the jury to agree upon a verdict, and the case was then continued until the next succeeding term of said court. The case was again tried at the October term of said court, resulting in a verdict that the defendant was guilty of voluntary manslaughter. A motion to set aside said verdict was overruled by the court, and judgment entered thereon, by which the defendant was sentenced to a term in the penitentiary of this State generally, which, under the statute, is a term of from one to five years. On February 6, 1950, we granted this writ of error to the judgment aforesaid.

The errors assigned may be limited to two in number. First, that the verdict of the jury was contrary to, and not supported by the law and the evidence, and that the trial court erred in overruling defendant's motion to set aside the verdict of the jury, and award him a new trial on that ground; and second, the giving of certain instructions, the effect of which was to tell the jury that the defendant, a police officer of the Town of Clay, was not authorized to attempt the arrest of the deceased, Noah Chapman, Jr., from which the homicide charged resulted, unless he was in a state of gross intoxication in a public

place, the contention of the defendant being that he had a right to make such arrest if the said Chapman was at that time and place in an intoxicated condition. To bring out these points it will be necessary to state, in part, the events leading up to the homicide for which the defendant, J. J. Mullins, stands charged in the indictment.

On the 3rd day of March, 1947, Noah Chapman, Jr. and his friend Robert Knotts, who apparently lived together on Mt. Pisgah near the Town of Clay, together came to the Town of Clay shortly after 11:00 o'clock in the morning. Knotts appears to have been driving a truck or other vehicle because he states that he drove Chapman to the steps leading up to the court house in Clay, and then went on to Dundon to get a load of coal. After getting the coal, he transported the same to his home, then came back to Clay about 2:00 o'clock in the afternoon, where he found Chapman at the lower end of the town, and they appear to have spent the evening at a poolroom or beer parlor. The evidence does not disclose the activities of Chapman from the time he separated from Knotts near the court house, until he and Knotts came together sometime after 2:00 o'clock in the afternoon. It is quite apparent that during this period of time Chapman purchased two fifths of whiskey, for, after his death, when his body was searched it was found that he had on his person two bottles of whiskey called fifths, one of which had not been opened, and the other of which was about two-thirds consumed. The testimony of Knotts is that during the afternoon when he and Chapman were together they each took one drink of whiskey, and each drank three bottles of beer, all of which leads to the inference that Chapman may have consumed the two-thirds of the fifth of liquor in one of the bottles purchased by him, other than the two drinks he and Knotts had together, and this in turn bears upon the probable state of intoxication, if any, of Chapman at the time of his attempted arrest by the defendant, which led to the unfortunate event which followed.

The evidence tends to show that Chapman and Knotts were together all of the afternoon, unless there was a possible few minutes trip on the part of Knotts to some point in Clay, which does not seem to be important; but in the evening, the exact hour being somewhat uncertain, but certainly not earlier than 5:00 o'clock, Chapman and Knotts seemed to have decided to go home. They first went to a drug store, made some purchases, then crossed the street to the opposite side, and up the street to a food market, a short distance above the Henry Clay Hotel, in the Town of Clay. About this time, the defendant, who will be referred to as Mullins, and who was regularly appointed and then acting as chief of police of the Town of Clay, drove his automobile to the vicinity of the Henry Clay Hotel, and while sitting there in his automobile, Chapman and Knotts walked up the street, went into the food market, and were in there from three to five minutes. After coming out of the food market they started down the street and were in the act of passing the Mullins' automobile. Mullins made some inquiry as to where they were going, and the evidence varies somewhat as to what was said by each of the parties, but at any rate Mullins attempted to place Chapman under arrest for drunkenness, and attempted to force him into his automobile with the idea that he would be taken to the town jail. Then began the struggle in which Mullins appears to have been the aggressor, for he struck Chapman with his mace several times. Mullins called upon several people to aid him, but, aside from one Smith, no one came to his aid. The street was icy, with some snow, Knotts then became involved in the struggle, and finally he and Smith took a mace away from Mullins, he having fallen on the ground on his back, with Chapman hovering over him, probably not entirely on his body, but at this time in some manner Chapman was shot and killed. Two shots were fired, one of which caused a superficial wound, the other was fatal.

We will not go into detail as to just how the homicide occurred. There is the usual contradiction on the part of the witnesses who stood by and saw and heard what

occurred, but who vary in their testimony, no two seeing the same thing. We have stated sufficient facts to warrant us in discussing one of the principle questions in the case which, if determined in favor of the defendant's contention, will call for a reversal of the judgment aforesaid, the setting aside of the verdict and granting a new trial, and this question revolves around the instructions given by the court, at the instance of the State, and the modification of certain instructions offered by the defendant, and, as modified, given by the court.

The crucial question arising from the giving of the instructions aforesaid is that of the right of the defendant Mullins to attempt the arrest of Chapman. It is conceded that Mullins, as a police officer, had the right to arrest Chapman if he was in a state of gross intoxication in a public place. It is contended by the defendant that he had the right to make such arrest if Chapman was in an intoxicated condition in a public place. The importance of this dispute is obvious. If, as the State claims, Mullins did not have the legal right to arrest Chapman unless he was in a state of gross intoxication, and the proof does not disclose that Chapman was in such a state of gross intoxication, then Chapman had the right to resist arrest. If Mullins was the aggressor, then, under the circumstances of this case, he could not rely upon self-defense as justification for his actions resulting in the death of Chapman.

With this explanation we proceed to state what the court did in the matter of instructions. At the instance of the State, the court gave the following instruction, which was a modification of an instruction offered by the State:

> "The court instructs the jury that the defendant in this case, J. J. Mullins, at the time he shot and killed the deceased, Noah Chapman, Jr., if the jury believes beyond a reasonable doubt that he so shot and killed him, was a duly qualified and acting police officer of the municipality of Clay, Clay County, West Virginia, and was under-

taking to arrest the said Chapman without a warrant upon the assumption that the said Chapman was drunk in his presence; that, as such police officer, the defendant had no legal right or authority to arrest the deceased without a warrant unless the deceased was in a state of gross intoxication in a public place in the presence of J. J. Mullins, or the said Mullins believed him to be so. If, therefore, you believe from the evidence in this case that, at the time the said J. J. Mullins undertook to arrest the deceased, the deceased was not in a state of gross intoxication in a public place, and that the said J. J. Mullins had no warrant for his arrest, then such attempted arrest was illegal and the deceased had the legal right to resist."

The State offered another instruction, which was modified by the court, and given in the language following:

"The court instructs the jury that the defendant in this case, J. J. Mullins, at the time he shot and killed the deceased, Noah Chapman, Jr., if he so shot and killed him was a duly qualified and acting police officer of the municipality of Clay, Clay County, West Virginia, and was undertaking to arrest the said Chapman without a warrant upon the assumption that the said Chapman was drunk in his presence; that, as such police officer, the defendant had no legal right or authority to arrest the deceased without a warrant unless the deceased was in a state of gross intoxication, or reasonably appeared to the officer to be in such state, in a public place in the presence of J. J. Mullins. If, therefore, you believe from the evidence in this case that, at the time the said J. J. Mullins undertook to arrest the deceased, the deceased was not in a state of gross intoxication in a public place, and did not so appear to the officer to be such state, and that the said J. J. Mullins had no warrant for his arrest, then such attempted arrest was illegal and the deceased had the legal right to resist arrest, if the deceased believed, and had reasonable grounds to believe, there was imminent danger that his life was in danger or that he was in danger of death or great bodily harm at the hands of the defendant."

The defendant offered twenty-four instructions, some of which were modified, but all of which were given. It is only necessary to deal with defendant's Instructions Nos. 8, 9, 10 and 13. Defendant's Instruction No. 8, as offered, would have told the jury, in substance, that if Chapman was intoxicated in the presence of Mullins on Main Street in said town, that such act and conduct on his part was an offense against the State, and was just and legal grounds for arrest without a warrant and that Chapman had no right to resist. This was modified by the court and the jury was told that Chapman had no right to resist arrest if he was in a grossly intoxicated condition. Instruction No. 9, offered by the defendant, would have told the jury that if Chapman appeared on Main Street in the Town of Clay in an intoxicated condition, then it was the duty of Mullins to arrest him. This instruction was modified and instead of the words "intoxicated condition" the language "such intoxicated condition" was inserted, evidently referring to grossly intoxicated condition." Instruction No. 10, as offered by the defendant, would have told the jury that if Chapman had pretended to be in an intoxicated condition in the presence of Mullins, which led Mullins to believe that he was, in fact, in an intoxicated condition, then it was the duty of Mullins to arrest Chapman. This instruction was modified to include the requirement that if Mullins believed Chapman grossly intoxicated he had the right to make an arrest without a warrant. Instruction No. 13, as offered by the defendant, would have told the jury that if Chapman appeared on Main Street in the Town of Clay in an intoxicated condition, or appeared to the said Mullins to be in an intoxicated condition, it was the duty of Mullins to arrest him, and to use such force as was necessary to effect that purpose. This instruction was modified by the use of the words "such intoxicated condition" evidently referring to the former instructions stressing the necessity of Chapman being in a grossly intoxicated condition in a public place, in the presence of an officer of the law, to justify his arrest without a warrant.

We have copied State's Instructions, and referred, in some detail, to the instructions offered by the defendant, and modified by the court, bringing out in bold relief the single question here involved, as it pertains to these instructions, and that is whether to justify an arrest, for a misdemeanor, without a warrant, by a police officer in a municipality in this State, the person sought to be arrested must be in a grossly intoxicated condition in a public place, in the presence of such officer; or whether being in an intoxicated condition in such circumstances will justify such arrest. There are, undoubtedly, plausible grounds for either position, and, as we think, the question depends upon the construction which we give to the statutes of the State on the subject of drunkenness in a public place. We assume there will be no question as to the common law rule that an officer of the law has the right to arrest for a misdemeanor without a warrant where the offense involved constituted a breach of the peace and is committed in the presence of the officer. Strictly speaking, intoxication alone is not ordinarily a breach of the peace, so that arrests for intoxication, whether the party involved is merely under the influence of intoxicants, or is in an intoxicated condition, or is grossly intoxicated, depends upon the provisions of our statutes, and with these statutes we will now attempt to deal.

Section 9 of Article 6, Chapter 4, Acts of the Legislature, 1935, as amended by Chapter 14, Acts of the Legislature, 1937, and as further amended by Chapter 8, Acts of the Legislature, 1945, now appearing as Michie's Code, 1949, 60-6-9, provides:

"A person shall not:

(1) Appear in a public place in an intoxicated condition;
* * *

"Any person who violates subsections one, two, three or four of this section shall be guilty of a misdemeanor and upon conviction shall be fined not less than five nor more than one hundred

dollars, or confined in jail not more than sixty days, or both such fine and imprisonment. * * *

"The sheriff of any county or his deputy is hereby authorized and empowered to arrest and hold in custody, without a warrant, until complaint may be made before a justice and a warrant issued, any person who in the presence of such sheriff or deputy violates any one or more of subsections one to six, both inclusive, of this section."

By Section 1 (h) of Chapter 30, Acts of the Legislature, 1935, Article 18, it is provided: "A justice shall have jurisdiction of the following offenses committed in his county, or on any river or creek adjoining thereto: * * *" As amended by Chapter 107, Acts of the Legislature, 1947, it provides: "A justice shall have jurisdiction of the following offenses committed in his county, or on any river or creek adjoining thereto: * * * (h) In all misdemeanor cases for the violation of the provisions of chapter sixty of said code as amended; * * *." These provisions appear in Michie's Code, 1949, 50-18-1.

By Code, 50-18-2, it is provided:

"Proceedings before a justice shall be by warrant of arrest in the name of the State, except that when an offense of which the justice has jurisdiction is committed in his presence, or in that of a constable, either of them may forthwith apprehend the offender or cause him to be apprehended, and in such case the offender may be tried before the justice and dealt with according to law, without such warrant."

By Chapter 15, Acts of the Legislature, 1943, it is provided:

"It is hereby made the duty of the mayor and the police of a municipality to aid in the enforcement of the criminal laws of the state within the municipality, independently of any provision of the charter or of any ordinance or want of an ordinance of such municipality, and to arrest or cause the arrest of any offender and take him be-

fore a justice of the peace of the county to be dealt with according to the law. Failure on the part of any such officer to discharge any duty imposed by this section shall be deemed official misconduct for which he may be removed from office. Such officer shall have the same authority to execute a warrant issued by a justice of the peace, and the same authority to arrest without a warrant for offenses committed in his presence, as has a constable."

By Chapter 16, Acts of the Legislature, 1943, dealing with powers and duties of sergeants and policemen, it is provided:

"\* \* \* For an offense committed in his presence such officer may arrest the offender without a warrant and take him before the mayor or other police court to be dealt with according to law. \* \* \*"

This section appears to deal with municipal offenses and is only mentioned to cover the general statutes in relation to the powers of municipal police officers to arrest without warrants in certain cases.

The statutes we have quoted seem to clearly establish the fact that to appear in a public place in an intoxicated condition is a misdemeanor for which either a sheriff, his deputy, a constable or a police officer in a municipality may arrest without a warrant, if the offense is committed in his presence. There appears to be no escape from this conclusion, considering alone the statutes we have quoted above, but, this does not give the entire picture. Code, 62-10-6, provides:

"If any person shall, in the presence of a constable and within his county, make an affray, or threaten to beat, wound or kill another, or to commit violence against his person or property; or contend with angry words to the disturbance of the peace; or improperly or indecently expose his person; or appear in a state of gross intoxication in a public place; such constable may, without warrant or other process, or further proof, arrest such offending person and take him before some

justice of the county in which such offense is committed, who, upon hearing the testimony of such constable and other witnesses, if any are then and there produced, if, in his opinion the offense charged be proved, shall require the offender to give bond or recognizance, with surety, to keep the peace and be of good behavior for a term not exceeding one year."

It is assumed that the trial court relied upon this statute when it gave the instructions to the jury in the trial of the case at bar.

The statute is very old, appearing in almost identical language as Section 9, Chapter 153 of the Code of 1868, and certain parts of it have an origin as early as the Code of 1849 in Virginia. It does not make the forbidden acts a crime, providing any punishment therefore, but was purely a statute to lay the foundation for a bond to keep the peace for a term of one year subsequent to such an offense. It cannot, we think, be read in *pari materia* with the statutes we have quoted above relating to the offense of appearing in an intoxicated condition in a public place, because the offenses are not the same, the penalties are not the same, the punishments are of a different type, and altogether we do not think this ancient statute, enacted for a particular purpose, should now be permitted to contravene the more recent Acts of the Legislature dealing with the subject of intoxication in a public place. The mere fact that gross intoxication must be shown before a person may be required to furnish bond for his good behavior for one year, does not mean that appearing in a public place in an intoxicated condition is not an offense for which, under existing statutes, sheriffs, their deputies, constables and municipal police officers may make an arrest when such offense is committed in the presence of such an officer. We are, therefore, of the opinion that when the trial court, at the instance of the State, instructed the jury that to justify defendant Mullins in attempting to arrest Chapman, he, Chapman, must have been in a grossly intoxicated condition, or so appeared to

Mullins, was erroneous, and placed too heavy a restriction upon the rights of a police officer to arrest without a warrant, for an offense committed in his presence. Clearly, under our statute, if Chapman was in an intoxicated condition on the main street of the Town of Clay, the police officers of that town had the right to arrest him if he appeared in their presence; and all of the evidence shows that Chapman did appear in the presence of Mullins, and whether he was in an intoxicated condition, or in a grossly intoxicated condition is a question of fact which a jury must determine. In our opinion, if, in a public place, he was either in an intoxicated condition, or in a grossly intoxicated condition, or so appeared to the police officer, that officer had the right to arrest him without a warrant, and it follows that in such a situation Chapman did not have the right to resist. If Mullins was warranted in attempting to make the arrest, then he was justified in taking such steps as were reasonably necessary to consummate the arrest, because resistance to the law, properly applied, cannot be tolerated under our system of government. *State* v. *Reppert,* 132 W. Va. 675, 52 S. E. (2d) 820.

We think our conclusions with respect to the giving of instructions disposes of this writ of error. The judgment of the trial court must be reversed, and the verdict of the jury set aside, because the jury was not properly instructed on the law applicable to the case. In view of the fact that there must be a new trial, we express no opinion upon the question of whether the evidence was sufficient to sustain a conviction. To express an opinion upon that point would transgress upon the rights of the jury to pass upon the same, perhaps under a different state of facts. There is involved in the case the question of whether or not Chapman was in an intoxicated condition, and, to some extent, whether he, in fact, resisted arrest, or merely attempted to avoid the result of the attack which the evidence shows defendant made upon him, and the conflict in the testimony of Mullins in the two trials as to

just how the killing occurred. We will let these matters rest for the determination of the jury on a new trial.

For reasons stated above, we reverse the judgment of the Circuit Court of Clay County, set aside the verdict of the jury, and remand the case to said court for a new trial.

*Reversed and remanded.*